**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| **JOHN TIPTON, Individually and as** | **PLAINTIFFS** |
| **Representative of TIPTON BROTHERS;** | |
| **CHARLES TIPTON, Individually and as** | |
| **Representative of TIPTON BROTHERS; and** | |
| **TIPTON BROTHERS** | |
| | |
| **vs.**        **Civil Case No. _____** | |
| | |
| **MONSANTO COMPANY;** | **DEFENDANTS** |
| **BASF SE;** | |
| **BASF CORPORATION;** | |
| **BASF PLANT SCIENCE, LP;** | |
| **E.I. DUPONT DE NEMOURS AND COMPANY;** | |
| **PIONEER HI-BRED INTERNATIONAL, INC.; and** | |
| **JOHN DOE COMPANIES A - Z** | |

<u>**COMPLAINT – CLASS ACTION**</u>

COMES NOW Plaintiffs, John Tipton, Charles Tipton, and Tipton Brothers on behalf of themselves, all others similarly situated, and the class they seek to represent for their Class Action Complaint against the named Defendants herein, state as follows:

**I.**        <u>**INTRODUCTION AND SUMMARY OF THE CLAIMS**</u>

1.        Plaintiffs bring this class action lawsuit for damages against Defendants, Monsanto, BASF, DuPont, and Pioneer, who jointly collaborated to develop and release a defective and unreasonably dangerous "dicamba-tolerant crop system," which has directly resulted in massive harm to crops in Tennessee, Arkansas, Arkansas, Missouri, Mississippi, and other states.

2.        These damages include, but are not limited to, crop damage, yield loss, total failure of the crop, and financial ruin to impacted farmers.

3.    Defendants' dicamba-tolerant crop system cannot be safely used for its intended purpose regardless the degree of care without causing collateral damage to nearby crops, which are not part of the Defendants' dicamba-tolerant crop system.

4.    Dicamba is a synthetic herbicide, which farmers have been using for decades to burn down fields in an effort to control weeds.  Due to the volatile nature of dicamba, farmers could only use dicamba during certain times of the year.

5.    Despite knowledge of the dangers dicamba posed, Monsanto and BASF jointly collaborated, designed, formulated, developed, tested, manufactured, marketed, promoted, advertised, released, and created a dicamba-tolerant crop system designed to combine Monsanto's dicamba-resistant seeds (hereinafter "dicamba seed") with Monsanto's dicamba-based herbicide (hereinafter "Xtendimax"), BASF's dicamba-based herbicide (hereinafter "Engenia®" or "Engenia"), and DuPont's dicamba-based herbicide (hereinafter "Fexapan"). This dicamba crop system is for an in-crop, over-the-top use, which is when a crop is emerging from the ground, for the first time ever to Tennessee farmers and farmers across the country at additional times during the crop growing season where it was previously restricted.

6.    Defendants have intricate knowledge of the agricultural process, including crops and herbicides.  With this superior knowledge of the agricultural production process and market domination, Defendants implemented, developed, and released their defective dicamba crop system on Tennessee farmers.

7.    Monsanto identifies the dicamba-seed and dicamba-herbicides as a "crop system," meaning dicamba-based herbicides, such as Monsanto's Xtendimax, BASF's Engenia, and DuPont's Fexapan, and dicamba-seeds are specifically designed for use in conjunction with one

another. Monsanto's website identifies dicamba-resistant seeds and the dicamba-based herbicides as a "crop system," also meaning the products should be used in conjunction with one another.

8.    This dicamba-tolerant crop system is inherently and unreasonably dangerous to nearby crops owned by farmers who did not purchase the dicamba seed.

9.    Defendants have long had knowledge and understanding of the physical characteristics, formulations, and properties of dicamba.   Defendants created a "new formulation" of dicamba herbicide, which causes damage to neighboring crops because of its volatility, i.e., from vapor particles lifting into the atmosphere and moving away from the intended target. This off-target movement includes climatic inversions where vapor particles volatilize and become suspended in air and move to a non-dicamba-resistant crop area. Further, dicamba can move by wind drift, water run-off, and by particles attaching to dust and moving to a non-dicamba-resistant crop area. This off-target movement results in, killing or damaging sensitive (non-dicamba-tolerant) crops.

10.    Defendants also knew the damaging nature and inherent danger of their genetically modified dicamba seed and dicamba herbicide, when joined together, formed a defective and unreasonably dangerous dicamba-tolerant crop system.

11.    At all relevant times, Defendants aggressively represented, marketed, advertised and promoted its "new" dicamba-resistant crop system as safe, including, "safety to nearby crops." BASF and Monsanto, in a joint press release, stated, "Both parties will participate in the development of innovative formulations for dicamba for use with herbicide-resistant cropping systems…Improved formulations are being developed to complement this new combination of herbicide-resistant crops." Despite Defendants' representations, marketing, advertising and

promotion to the contrary, Defendants' dicamba-tolerant crop system has caused massive crop damage to farmers, including Plaintiffs.

12.     In actuality, Xtendimax, Engenia, and Fexapan are not appreciably less volatile than prior formulations of dicamba and have caused serious harm to crops throughout the United States.

13.     Defendants knew soybeans are highly sensitive to extremely low doses of dicamba. Dicamba had been available for 50 years for corn, small grain, and pastures. However, dicamba was not applied to soybeans over-the-top. Thus, Defendants' new formulation was a whole new introduction, not only in mass, but to a crop that is highly sensitive to dicamba. Therefore, nearby crops were imminently at risk when the dicamba-tolerant crop system was introduced.

14.     Plaintiffs bring this class action on behalf of farmers whose crops have been materially and significantly damaged by Defendants' negligent control, testing, training, development, marketing, promotion, advertising, and distribution of the dicamba crop system, which proximately caused significant and material injury and damage to Plaintiffs' crops in 2016 and 2017.

15.     Because of Defendants' willful conduct, Plaintiffs' crops are not resistant to dicamba and have been devastated by dicamba damage due to the spraying of volatile, drift-prone dicamba over dicamba-tolerant products. Accordingly, Plaintiffs bring their lawsuit under state law claims of (1) strict products liability; (2) negligence; (3) breach of implied warranty of fitness for a particular purpose; (4) breach of implied warranty of merchantability; (5) Tennessee Consumer Protection Act of 1977; (6) fraudulent concealment; (7) express warranties by

affirmation, promise, description, or sample; (8) fraud; (9) unjust enrichment; (10) civil conspiracy; (11) private nuisance; and (12) trespass to chattels.

16.    Plaintiffs seek relief in the form of compensatory damages, punitive damages, and attorneys' fees and other costs of litigation.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this lawsuit pursuant to U.S.C. § 1332(d) because there is complete diversity of parties.  Plaintiffs individually also seek more than $75,000 for damages, punitive damages and also injunctive relief.

18.    Additionally, this Court has jurisdiction over this case under 28 U.S.C. § 1332(d)(2)(A) and (C).  This case is a class action, as defined by 28. U.S.C. § 1332(d)(1)(B), and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Plaintiffs, individually, and those similarly situated, as more particularly set forth below, include citizens of Tennessee.

19.    Plaintiffs are residents and citizens of Tennessee who have property affected by Defendants' conduct and represent similarly situated injured persons and entities from various states injured by Defendants' uniform corporate conduct and partnership in the release of an inherently dangerous and volatile crop-system on the market, which has directly impacted and severely damaged Plaintiffs' livelihood of growing crops.

20.    At all relevant times herein, Defendants have jointly researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, promoted, packaged, advertised and made representations regarding dicamba-resistant crops and dicamba herbicide.

21.     This Court has both specific and general personal jurisdiction over the parties. Defendants have engaged in such continuous, systematic and continually conduct business in the State of Tennessee that the Defendants are "at home" in the State of Tennessee.  Defendants actively engaged in the promotion and use of their inherently dangerous and volatile crop-system in Tennessee, Kansas, Arkansas, Missouri, Mississippi and other states, have distributed dicamba herbicide applicators and have performed training, education and information schools in Tennessee, Kansas, Arkansas, Missouri and Mississippi and other states.  Defendants have performed GMO crop and dicamba-resistant crops and dicamba herbicide testing on test plots in the State of Tennessee, avail themselves of the opportunity to conduct business in this State, sell crop products, make representations, market, advertise, promote and distribute their crop products in this State and have committed tortious acts in the State of Tennessee.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because (1) Plaintiffs reside in this District; (2) Defendants have engaged in substantial conduct and business relevant to Plaintiffs' claims within this District; and (3) Plaintiffs have suffered substantial losses from dicamba herbicides due to Defendants' wrongful conduct within this District.

### III.     PARTIES

23.     Plaintiffs John Tipton, Charles Tipton and Tipton Brothers farm soybeans in Tipton County, Tennessee, and Mississippi County, Arkansas.

24.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri, 800 N Lindbergh Blvd, Saint Louis, MO 63167.

25.     Defendant BASF, SE, a German company, has its headquarters at Ludwigshafen, Germany.  BASF states that "[with an area of approximately ten square kilometres, the Ludwigshafen Verbund site is the world's largest integrated chemical complex."

26.     Defendant BASF Corporation is a Delaware corporation with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey.  Defendant BASF Corporation is the affiliate, subsidiary, agent, distributor and North American agent for BASF SE, a German company (hereinafter jointly referred to as "BASF").

27.     Defendant BASF Plant Science LP ("BASF Plant Science") is a subsidiary of BASF, SE.  Its corporate office is located at 100 Campus Drive, Florham Park, New Jersey 07932.  Its registered agent is CT Corporation System, 160 Mine Lake CT, Suite 200, Raleigh, North Carolina 27615-6417.

28.     BASF Plant Science LP is a partner with BASF Corporation and conducts research on herbicides and genetically modified organisms.  BASF Plant Science is a subsidiary of BASF in which all plant biotechnology activities are consolidated. The GmbH was founded in 1998 and employs approximately 700 people at 6 different locations worldwide.

29.     The headquarters of BASF Plant Science is located in Research Triangle Park (North Carolina). Plant Science has research sites in the US, Canada and Europe. At these locations, the company is mainly developing genetically modified seeds.

30.     BASF Plant Science genetically modified crops like maize, soy, cotton, canola, sugarcane, sugar beet and potatoes "for a more efficient agriculture". Together with subsidiaries and partners, as well as in cooperation with universities and research institutions, BASF Plant Science is also developing new procedures and practices in genetic technology.

31.     Genetically modified crops by BASF are sold and distributed through biotechnology companies like Monsanto, KWS Saat, Embrapa, or CTC (Centro de Tecnologia Canavieira).

32.     BASF also has an extensive agricultural herbicide presence in Missouri, including large agricultural chemical facility in Hannibal (Palmyra), Marion County, Missouri, which produces agricultural chemicals, including KIXOR® Herbicide, PROWL® Herbicide, PROWL H2O® Herbicide PURSUIT® Herbicide, RAPTOR® Herbicide, ARSENAL® Herbicide, CADRE® Herbicide, PHANTOM® Herbicide, EXTREME® Herbicide and BASAGRAN® Herbicide.

33.     The Hannibal Missouri BASF agricultural herbicide manufacturing facility started production in 1966.  The facility is located on Route JJ, 10 miles north of Hannibal on Route 168 and 6 miles south of Palmyra and U.S. 61.  It has 4 Active Ingredient Manufacturing and 1 Formulation Packaging plants at the Hannibal Missouri site.  It employs 347 employees.

34.     Defendant E.I. duPont de Nemours and Company is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

35.     Defendant Pioneer Hi-Bred International, Inc., d/b/a Dupont Pioneer, is a corporation organized under the laws of the State of Iowa and maintains its principal place of business at 7000 NW 62nd Avenue, Johnston, Iowa 50131. Pioneer Hi-Bred International, Inc. is an affiliate, subsidiary, distributor, and agent of Defendant E.I. duPont de Nemours and Company.

36.     At all relevant times herein, Defendants acted together, and in-concert, as agents, joint-venturers, joint-enterprises, partners and co-conspirators with sharing of proprietary

genetically modified crop traits, field testing, training of farmers and other shared corporate conduct, including joint promotion and financial benefits from their shared corporate conduct, with each other's actions directed toward the purpose or releasing an inherently dangerous, unsafe and volatile crop system, thereby imputing each other's conduct to one another.

## IV. FACTS

37.    A useful and marketable herbicide must be capable of suppressing growth of undesirable plants without materially adversely impacting human health or the environment, including desirable, non-target crops and plants.

38.    It is incumbent upon one who manufactures, formulates, packages or distributes an herbicide to be aware of its product's phytotoxic characteristics, both with regard to the target plants as well as potential off-target plants, and to take appropriate actions to ensure that off-target plants are not collaterally injured with its use.

39.    Dicamba is an herbicide, often used to kill palmer amaranth (commonly referred to as "pigweed").  It is known to have extremely negative effects on certain crops, including but not limited to, soybeans.

40.    The dicamba-based herbicides that were approved for use at all times relevant to this lawsuit were volatile and prone to drift or inversion.

41.    Monsanto designed, developed, marketed, distributed, and sold Round Up Ready 2 Xtend soybeans and Bollgard II XtendFlex cotton seeds (collectively, "dicamba seed(s)"). Dicamba seeds are currently resistant to the negative effects of dicamba-containing herbicides.

42.    The cultural environment of the agricultural industry involves agreements between seed manufacturers/distributors and consumers to protect special, proprietary, patented technology of genetically modified organisms and herbicides, in which the Defendants have

significant and substantial monetary interests. Monsanto has intervened in multiple lawsuits to protect their interests in their patented technology.

43. At the time Defendants began selling dicamba seeds, Defendants were not selling an EPA-approved dicamba herbicide that was not prone to drift or volatilization and off-target vapor movement.

44. In 2017, Defendants knew dicamba bases, such as Engenia, are highly volatile relative to other herbicides and prone to off-target movement, which can cause damage to sensitive (non-dicamba-tolerant crops), particularly soybeans and other crops highly sensitive to dicamba.

45. Defendants marketed, distributed and sold the dicamba-tolerant crop system that contributed to the harm sustained by Plaintiffs.

46. Tennessee is one area where soybeans have been significant crops for decades.

47. Damage to off-target soybean and other crops has repeatedly been documented due to drift of dicamba-containing products in Tennessee, as well as other states. The use of dicamba-containing products has been restricted or prohibited in many locations where sensitive crops are grown. The Defendants have therefore known, or should have known, of dicamba's lack of selectivity and its extreme phytotoxicity to desirable non-target plants, and therefore, of the potential for collateral harm through drift of dicamba-containing products if applied in proximity to such crops.

48. Despite such knowledge, Defendants have continued to market and sell dicamba seeds to farmers in Tennessee and failed to warn or instruct or otherwise limit the use of dicamba-containing products either geographically or temporally so as to reasonably assure that harm would not occur to other crops growing in the region.

49.     For Crop Year 2017, dicamba seeds were approved for use by the Tennessee Department of Agriculture.

50.     In 2016, Separate Defendant, Monsanto did not receive approval for any dicamba-containing herbicide for use with dicamba seeds.  Yet, Monsanto rushed its crop-system forward even publicly commenting that it may "pre-order" reservations for its dicamba system and announced it would begin selling soybeans irrespective of EPA approval.

51.     At this same time, Defendants suppressed, withheld and concealed critical, material facts from regulatory authorities regarding its lack of testing on volatility of its products. Monsanto relied on misleading volatility testing and did not allow independent and unbiased tests on volatilization despite receiving multiple requests.  When specifically confronted about this testing validity issue on August 8, 2016, Boyd Carey, a Monsanto representative, stated to the Arkansas State Plant Board such tests would ***not*** be allowed because the results might jeopardize Monsanto's registrations of its products, therefore, delaying regulatory approval of the dicamba-tolerant crop system.

52.     Nonetheless, without approval for Monsanto's dicamba-based herbicide in 2017, Defendants encouraged farmers in Tennessee to plant dicamba-tolerant crops and use dicamba-containing herbicides made by companies other than Monsanto, namely BASF's Engenia.

53.     Defendants took these actions, knowing that dicamba-containing products would cause injury to crops grown from any other technology other than dicamba-tolerant crops.

54.     The injury caused by exposure to dicamba-containing products resulted in financial losses to all Plaintiff farmers.  Injury from non-target injury is uniform from the inherently dangerous volatility of Defendants' crop system.

55.    The proximate cause of the injury was the defective design, marketing, selling, and misbranding of dicamba seeds and their lack of suitability for the particular purpose for which they were sold in the area in question during the timeframe involved and a lack of merchantability.  Defendants were willful and negligent in their premature release, marketing, and selling of a defective crop system without an accompanying EPA-approved dicamba herbicide.

56.    Defendants were further willful and negligent in rushing the dicamba-tolerant crop system to market without adequate testing in the southern states for volatility and known inversion situations with dicamba in different environmental conditions.

57.    In 2017, Defendants were further willful and negligent for warranting, assuring, promising and representing the "new formulation" of dicamba and dicamba-tolerant crop system as safe for neighboring crop systems in a marketplace controlled by Defendants so as to advance an unsafe and inherently dangerous product to the marketplace to enhance revenue.

58.    Defendants have common-law and statutory duties to give reasonable and adequate warning of dangers reasonably foreseeable in the use of their productions to others, as well as such instructions as may be needed to make it reasonably likely that such harm will be avoided if followed.

59.    None of the labels for Defendants' products provide full, complete, and accurate information about the extreme toxicity of dicamba-containing products.

60.    None of Defendants' labels contain directions for use that, if complied with, are adequate to protect the environment, including Plaintiffs' crops. Defendants' labels do not and never have contained warning or caution statements that, if complied with, are adequate to protect the environment, including Plaintiffs' crops.

61.    Moreover, Defendants made false, deceptive, misleading statements of material fact about the safety of their dangerous product with knowledge that their statements and representations would be relied upon in a marketplace they control and their product would be purchased en masse, thus, creating large areas of harm to those farmers who did not purchase dicamba-tolerant crop seeds or plant dicamba-tolerant crops.

62.    Defendants sold such GMO products and crop-systems through their partnership and agreement with the knowledge and intent that farmers who were injured would have no alternative, but purchase their products and crop-system (as a defense) to avoid their crop from being ruined, thus further enhancing Defendants' revenue and complete control of the marketplace for dicamba-tolerant soybeans and crop systems and control and domination of the soybean and cotton markets.

63.    Such unlawful conspiracy was made with their superior knowledge of the GMO crop system and volatility of its modified dicamba formulations and with their intent to obtain billions in revenue from sales of its dicamba-tolerant crop system.

64.    Defendants, as a part of an agreement, scheme and device, intentionally, willfully and wantonly suppressed, concealed and omitted material facts when they knew their products were unsafe, hazardous and dangerous to non-dicamba tolerant crops, but with this knowledge proceeded with distributing, selling, wholesaling, promoting, marketing, advertising, warranting and assuring farmers and the public that its new dicamba-tolerant products and crop system were safer for nearby crops even though they had knowledge that its system was not safe and would cause harm, thus, perpetuating a system where harmed farmers would purchase their products (play defense farming) to avoid crop damage and financial ruin.

65.    The inherent, phytotoxic profile of dicamba-containing products cannot be applied with reasonable safety in any area, particularly in Tennessee, using any typical or reasonably practical application techniques and conditions of use limitations, given the well-recognized nature and patterns of cultivation in that region, their regional proximity to one another, the foreseeable weather patterns and timing of likely application. Accordingly, the dicamba-tolerant crop system is defective as inherently posing an irreducible, unreasonable risk of harm to crops grown in the regions that are not resistant to dicamba.

66.    Defendants' dicamba-tolerant seed and herbicides are inherently dangerous, volatile, hazardous and unsafe for neighboring crops resulting in direct harm to Plaintiffs and similarly situated farmers, persons and entities who have experienced crop damage due to Defendants' products placed in the marketplace.

## A. RELEVANT HISTORY OF DICAMBA AND DICAMBA-TOLERANT CROPS

67.    BASF represents the history of dicamba as follows:



68.    Dicamba is a broad-spectrum, synthetic auxin herbicide that kills broad-leafed weeds before and after they sprout by increasing a plant's growth rate so the plant outgrows its nutrient supply and dies.

69.    Dicamba is extremely toxic to virtually all broadleaf plants (plants that are not grasses), such as fruits, nuts, vegetables, and it is especially toxic to soybeans and cotton due to the extreme sensitivity to conventional (non-dicamba-tolerant) soybeans and cotton.

70.    Before the BASF and Monsanto partnership and joint venture, the permitted use of dicamba was solely for the purpose as a pre-emergent and post-harvest burndown application, never for in-crop, over-the-top use on soybeans.

71.    In April 2010, Defendant Monsanto made its first submission to the EPA to register dicamba formulations for a new use in conjunction with genetically modified, "dicamba-tolerant" soybeans.

72.    In 2012, Defendant Monsanto submitted its petition to the EPA to register dicamba for in-crop, over-the-top use with Monsanto's corresponding Xtend cotton seeds.

73.    In January 2015, the U.S. Department of Agriculture ("USDA") announced its decision (after a five-year investigation) to deregulate Defendant Monsanto's dicamba-tolerant crop technology for soybeans and cotton, authorizing the crops for unrestricted commercial planting.

74.    When BASF was registering Engenia, the EPA stated, "Registration is in no way to be construed as an endorsement or recommendation of this product by the Agency."

75.    Before the approvals in 2016, the EPA had stated, "Current allowable uses for dicamba products are restricted to *pre-plant and post-harvest burndown applications*." The EPA also stated: "*Dicamba is a highly volatile herbicide prone to move off target by the way of drift or through vapor volatility.*"

76.    On December 20, 2016, BASF received conditional approval for two years for Engenia.

77.    On December 21, 2016, BASF secured EPA approval for its dicamba herbicide, Engenia, for use on dicamba-tolerant soybeans and cotton.

78.    Following approval, BASF began to market, distribute, and sell Engenia at enormous rates for the 2017 growing season.

## B. DEFENDANTS' DICAMBA-TOLERANT CROP PARTNERSHIP

79.    Monsanto has a partnership, joint-enterprise and joint venture with BASF in research, development, and marketing of herbicides and weed control products, including dicamba products.  Monsanto and BASF have formally collaborated with each other since 2005 regarding genetically modified crops and herbicides.

80.    In the 1980's, Sandoz Agro, Inc. (hereinafter "Sandoz"), had been studying strains of bacteria regarding dicamba and dimethylene.

81.    During the 1980's, Donald P. Weeks, a biochemist worked at Sandoz in researching and developing bacteria, namely D1-6, that could degrade dicamba in a plant fast enough where the plant would survive, but the surrounding weeds would die.

82.    In 1989, Dr. Weeks left Sandoz and became an employee at the University of Nebraska-Lincoln. At the University of Nebraska-Lincoln, Dr. Weeks served as the Director of the Center for Biotechnology Research from 1989 through 1997.

83.    More fully detailed herein, from 1993 to 1997, the University of Nebraska-Lincoln and Sandoz Ltd. jointly researched and developed dicamba degrading enzymes to be used as trait technology to develop dicamba-tolerant crops.

84.    In February of 1993, Sandoz entered into an agreement with the University of Nebraska-Lincoln for a project titled, "GENETIC ENGINEERING OF SOYBEAN PLANTS FOR LOWER COST WEED CONTROL."

85.     The agreement between Sandoz and the University of Nebraska-Lincoln required Sandoz to fund research to support the development of dicamba-tolerant crops.

86.     The research sought to incorporate genes which encode enzymes for dicamba inactivation into dicamba sensitive plants to provide the genetically modified plants with protection against the harmful herbicidal activity of dicamba.

87.     The ultimate goal of the research was to develop fast-acting dicamba-degrading-enzymes in order to develop transgenic dicamba-tolerant plants.

88.     In an effort to facilitate the research, Sandoz provided D1-6 bacterium, which Dr. Weeks worked with during his employment with Sandoz, and permitted the University of Nebraska-Lincoln to use D1-6 in the joint research.

89.     In April of 1995, the University of Nebraska-Lincoln requested more funding for Sandoz, which extended the joint research contract to March 1, 1996.

90.     In January of 1996, the University of Nebraska-Lincoln again received additional funding from Sandoz to extend the joint research contract from March 1, 1996 to March 1, 1997, for completion of the research.

91.     On September 26, 1996, Sandoz Ltd., entered into an Asset Purchase Agreement (hereinafter "Sale") with BASF Aktiengesellschaft regarding Sandoz's line of dicamba technology.

92.     The Sale included in section "(c) Dicamba" that "all the Seller's and the Subsidiaries' right, title and interest in and to United States and Canada patents for dicamba-based products…including patents and any patent applications…."

93.     The Sale further included, "all the Seller's and Subsidiaries' right, title and interest in and to production and formulation know-how for dicamba and dicamba-based

products…" as well as, "…trademarks and servicemarks for dicamba and dicamba-based products…."

94.　　On November 17, 2004, the Board of Regents of the University of Nebraska-Lincoln filed a Complaint against BASF Corporation seeking declaration "that BASF does not possess any right, title, or interest in a non-exclusive license to make, have made, use, or sell inventions, including know-how and resulting patents, in certain technology developed by the University with funding from Sandoz Agro, Inc."

95.　　On January 12, 2005, the University of Nebraska-Lincoln and Monsanto Company entered in to an agreement regarding the "exclusive license of certain patent rights owned by" the University.

96.　　Specifically, the agreement between the University of Nebraska-Lincoln and Monsanto Company covered "U.S. and foreign patent applications which have patent claims which would, if issued, cover the making or reproduction of transgenic organisms, including plants, which exhibit resistance to dicamba herbicide."

97.　　On March 23, 2005, Monsanto released a press release stating, "Biochemist Don Weeks and colleagues identified a gene that can make dicamba-sensitive crops such as soybeans tolerant to the widely used herbicide. The university has several patents pending on this discovery." - <http://news.monsanto.com/press-release/monsanto-unl-sign-agreement-develop-dicamba-tolerant-crops>.

98.　　On January 25, 2006, Monsanto intervened in the University of Nebraska-Lincoln/BASF lawsuit, requesting the court to declare the University of Nebraska-Lincoln's grant of an exclusive license to Monsanto to the rights and intellectual property of the dicamba-tolerant seed trait and declare BASF has no rights in the matter.

99.    On May 18, 2006, Monsanto intervened in the lawsuit filed by the Board of Regents of the University of Nebraska against BASF asking the court to grant Monsanto exclusive rights and to declare that BASF does not possess any right, title, or interest in a non-exclusive license in the patents and technology that ultimately led to Defendants' dicamba-tolerant crop system.

100.    In 2007, BASF and Monsanto publicly stated they would dedicate a joint budget of $1.5 billion for a research and development collaboration to fund a pipeline of yield and stress tolerance traits for corn, soybeans, cotton and canola.

101.    By March 22, 2007, BASF and Monsanto made a research and development joint collaboration for a "new" approach to the food system, using dicamba-tolerant crop system for in-crop use for the first time.

102.    BASF and Monsanto's partnership involves sharing profits. Monsanto "will market products developed from the collaboration, and will receive 60 percent of net profits, while BASF will receive 40 percent." "The first product developed as a result of the R&D agreement is expected to be commercialized in the first half of the next decade."

103.    The partnership involved the gradual application by Monsanto for "dicamba-tolerant" crops.

104.    By 2007, BASF's plant science unit had also entered a partnership with Monsanto. The plant science division develops genetically-modified seeds for crops such as corn, soybeans, cotton and rice.

105.    BASF has publicly stated, "Monsanto is a ***strong partner*** with outstanding capabilities."

106.    By June 23, 2008, BASF and Monsanto had entered into an "exclusive agreement for a new fungicide seed treatment solution for soybeans in the United States…The treatment, which is expected to be commercialized in conjunction with the launch of Monsanto's Roundup Ready 2 Yield soybean seed…."

107.    Finally, in 2008, BASF, Monsanto, and the University of Nebraska-Lincoln jointly moved and stipulated to dismiss claims in the University of Nebraska-Lincoln-BASF-Monsanto lawsuit.

108.    Continuing in 2008, Monsanto's Executive Vice President, Carl Casale, stated, "We're pleased to be *partnering* with BASF to deliver new seed-based technology to soybean farmers."

109.    On January 20, 2009, BASF and Monsanto jointly announced that both entities had formally entered into a "new joint-licensing agreement to accelerate the development of the next-generation of dicamba-based weed control chemistry products. Both parties will participate in the development of innovative formulations for dicamba for use with herbicide-resistant cropping systems."

110.    After three years of jointly developing products that, in field testing, "have shown significant yield increases in corn, soy, and canola, the companies are confident that they can also help farmers meet the growing long term demand for wheat."

111.    In 2010, BASF and Monsanto formed a new agreement that resulted in a potential additional investment of more than $1 billion by the companies over the life of the collaboration.

112.    BASF Plant Science's President, Peter Eckes, stated, "The collaboration with Monsanto was not only the first agreement that we entered, it also represents out most

*significant partnership*, covering several large row crops…The expansion of our *partnership* reflects the fit between two companies."

113.    BASF and Monsanto, in a joint press release in 2010, announced:

"[S]ignificant progress toward launching next-generation dicamba based weed control systems for soybeans and cotton…The companies recently completed joint field testing of new dicamba-based formulations applied over the top of Monsanto's next generation dicamba-tolerant soybean technology in development. The research, conducted at Monsanto's Monmouth, IL research facility, demonstrated excellent weed control and ***crop safety*** on the dicamba-tolerant soybeans."

Defendants are representing that they have tested the crop system, and it has "excellent crop safety."

114.    In a 2010 joint press release, BASF's President of the Crop Protection Division, stated, "The dicamba tolerant system is designed to give growers pre- and post emergence application flexibility…." Stating further, BASF and Monsanto represented, "Additional field studies at various BASF research locations supported these results and ***confirmed*** significantly improved attributes compared to formulations available in the market today. This ***new formulation*** work offers even further improvement in physical characteristics that result in ***better performance and safety to nearby crops***…aimed at offering farmers multiple modes of action and ***superior application timing flexibility*** in combating yield-robbing weeds."

115.    On November 2, 2010, BASF and Monsanto issued a joint press release announcing, "significant progress towards a next generation dicamba based weed control system for soybeans and cotton." Monsanto's VP of Crop Protection, Kerry Preete, stated, "Together the strength of the formulation expertise BASF has with dicamba and our team's biotech focus seeks to deliver another breakthrough product in weed control."

116.    On January 6, 2011, Monsanto issued a press release in conjunction with BASF with a list of collaborative "Agronomic Traits Projects," which included, "Dicamba-Tolerant Soybeans (Advanced to Phase 4) – The addition of dicamba-tolerance to the Genuity® Roundup Ready 2 Yield® soybean platform would enable the use of dicamba and glyphosate for pre-plant burndown and in-season weed control, resulting in an effective and high yielding weed management system." Defendants' planned, joint collaboration in products specifically included the dicamba-tolerant soybean used in the dicamba-tolerant crop system, wherein the herbicide is causing significant damage to Tennessee farmers.

117.    In that same press release on January 6, 2011, Monsanto quoted BASF Plant Science's President, Peter Eckes, stating, "The advances in development show that we chose the right path in our ***partnership*** with Monsanto…BASF is confident that ***our*** genes will result in crops that produce significantly higher yields and that we will be able to make these available to farmers in the future."

118.    Some BASF and Monsanto Projects are jointly funded through each phase of development, and products that emerge from the joint development are commercialized by Monsanto. The profits associated with commercialized products are shared, with Monsanto receiving 60 percent of net profits and BASF receiving 40 percent of net profits.

119.    On March 14, 2011, in a joint press release titled, "BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level," BASF and Monsanto jointly announced, "[A] new agreement to collaborate on the advancement of ***dicamba tolerant cropping systems***. The companies have granted reciprocal licenses, and BASF has agreed to supply formulated dicamba herbicide products to Monsanto.[1] The agreement will facilitate

---

[1] BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level (Monday, March 14, 2011).

further development work and subsequent commercialization of a ***dicamba tolerant system***, which includes innovative dicamba formulations proprietary to BASF and the dicamba tolerant trait for soybeans, which is proprietary to Monsanto…the two companies will ***collaborate*** on the development of ***stewardship guidelines and best management practices for the dicamba tolerant system***."

120.    Further in 2011, Markus Heldt, President of BASF's Crop Protection Division, represented, "Our next generation of products will offer ***yet another step change in volatility reduction*** while maintaining the highest level of weed control. ***The system***, along with proper stewardship measures, will ultimately ***deliver peace of mind for growers***." Likewise, Monsanto has represented that a low volatility dicamba herbicide "provides growers and applicators confidence in on-target application of dicamba."

121.    After joint testing at Monsanto's research facility in Monmouth, IL, Monsanto and BASF jointly stated, "***Joint development of stewardship, education programs, and best practices*** will support long term sustainability of the DT [dicamba-tolerant] system." This jointly used proprietary, seed-herbicide system was neither endorsed, nor recommended by the EPA; however, it was conditionally approved for responsible use for two years.

122.    This partnership and joint venture permitted BASF to register BASF's dicamba herbicide Engenia with the EPA registration designed to be used with dicamba-tolerant genetic seed traits.

123.    Again, in 2015, BASF and Monsanto jointly announced:

Monsanto Company's annual research and development (R&D) update published today highlights project advancements across the company's six research and development platforms, including: breeding, biotechnology, crop protection, ag microbials, ag biologicals, and precision agriculture, all aimed at sustainably maximizing farmer productivity while utilizing resources like water and land more efficiently.  Monsanto has a pipeline of

> exciting products in development, including yield and stress work in collaboration with BASF Plant Science. This yield and stress collaboration focuses on key row crops with joint investments of $2.5 billion over the life of the collaboration.

124. Monsanto's active partnership with BASF, German chemical company, was designed to accelerate the development of dicamba-based weed control products in the United States and world-wide.

125. In the United States, BASF Corporation, headquartered in Florham Park, New Jersey, is a wholly-owned and controlled American subsidiary of BASF SE. BASF Corporation manufactured several dicamba herbicides, including Banvel, Clarity, Distinct, Marksman, Status, and Engenia.

126. In November 2010, Monsanto and BASF jointly stated they recently completed field testing of the dicamba-based herbicides. In tests, the dicamba-tolerant crop system was tested over-the-top at Monsanto's research facility in Monmouth, Illinois.

127. BASF and Monsanto jointly tested, researched and developed the dicamba-tolerant crop system "Monsanto supplied BASF with enough dicamba-tolerant soybean and cotton seed to plant about 40 demonstration plots in 2014." Luke Bozeman, BASF technical market manager with Engenia responsibilities, noted, "We won't be demonstrating the seed per say; we will be demonstrating the use of Engenia a herbicide-seed system to control a wide range of weeds, in particular some of the glyphosate-resistant weeds. The stewardship demonstration component is the second leg – how to apply it so that you don't negatively impact an adjoining sensitive crop.".

128. As Defendants' dicamba-tolerant crop system was developing toward a point where it would be submitted to government authorities, at least by 2012, weed scientists, agronomic crop growers, and specialty crop growers began warning consumers and growers

alike of the danger of dicamba-resistant crops, including dicamba's propensity to volatilize and move onto sensitive, neighboring crops and how dicamba will accelerate the evolution of super weeds.

129. The new formulations, which are Engenia, Xtendimax, and Fexapan, had the same old problem, that is, it would volatilize, move off-target and harm nearby crops. Worse, Defendants advanced the commercialization under a false pretense – that it could be applied onto crops, over-the-top, for in-crop use, thereby enhancing the danger and imminent harm to nearby non-dicamba-tolerant crops.

130. During this same time, in 2012, Monsanto submitted its petition to the EPA to register dicamba for in-crop use with cotton.

131. In 2013, Monsanto submitted its application to deregulate dicamba for in-crop use with genetically modified cotton.

132. In June 2014, BASF announced plans to boost production of its dicamba weed killers by fifty percent (50%) to keep pace with anticipated demand should Monsanto receive regulatory approval to sell its new GM soybean and cotton products.

133. Six months later, in January 2015, BASF's plan paid off when the USDA announced its decision (after a five-year investigation) to deregulate Monsanto's dicamba-tolerant crop technology for soybeans and cotton, authorizing the crops for unrestricted commercial planting.

134. On December 21, 2016, BASF secured EPA approval for its dicamba herbicide, Engenia, for use on dicamba-tolerant soybeans and cotton.

135.    In March 2013, Monsanto entered into a licensing agreement with Dupont and its subsidiary Pioneer Hi-Bred International, Inc. to allow for the use and sale of dicamba resistant Xtend soybeans.

136.    In June 2016, Monsanto entered into a multi-year agreement to supply Dupont with dicamba formulations developed and manufactured pursuant to Monsanto's joint licensing agreement with BASF. The dicamba supplied to Dupont by Monsanto through the agreement referenced in paragraph 23 above, is sold by Dupont as Fexapan.

137.    The herbicides that would come to be known as Xtendimax, Engenia and Fexapan were results of the joint research, design and testing by Monsanto and BASF pursuant to their joint licensing agreement.

138.    Xtendimax, Engenia and Fexapan are jointly designed and manufactured by Monsanto and BASF pursuant to their licensing and supply agreements.

139.    Monsanto designs and manufactures all Xtend seeds sold by Monsanto and Dupont.

140.    Pursuant to agreement between Monsanto and BASF, Monsanto would market and sell Xtendimax for use during the 2017 growing season, while BASF would market and sell Engenia for use during the 2017 growing season.

141.    Monsanto supplied and licensed the herbicide Fexapan to Dupont under a July 2016 agreement. Pursuant to agreement between Monsanto and Dupont, Dupont would market and sell Fexapan during the 2017 growing season.

142.    In March 2013, in the midst of settling pending antitrust claims filed against it by Dupont, Monsanto also agreed to license dicamba resistant soybean seed technology to Dupont.

## C.    **DEFENDANTS' ATTEMPTS AT STEWARDSHIP**

143.    In Tennessee as well as other farming states, Defendants implemented training, education, curriculum, instruction, supervision, and the means and methods for dicamba herbicide spraying and application. As such, Defendants represented by their control, conduct and superior knowledge that they had the ultimate responsibility to fully and properly train, educate, and instruct farmers. Through their direct, special relationship with farmers who purchased their seed system, Defendants assumed the responsibility to "***explain and promote the proper, responsible use of its products***." Defendants embraced their conduct in the following quotes:

"BASF's long-standing stewardship ***responsibility*** to growers through a one-of-a-kind educational program."

"We [Monsanto] are committed to the success and ***safety*** of our growers. By promoting proper and responsible use of our technologies, we aim to ensure environmental standards are met and the safety of our people and communities is protected."

144.    Defendants' special relationship with growers using the dicamba-tolerant crop system required them to fully disclose the risks and dangers involved in the distribution of their highly volatile, toxic herbicide seed system to nearby crops. This includes the disclosure of the risk of the mass introduction and expansion of the newly formulated dicamba caused by Defendants' rapid, immense toxic seed system herbicide dump. Monsanto's conservative estimates predicted that dicamba use on soybeans would go ***from 233,000 pounds per year to 20.5 million pounds per year***, and dicamba use on cotton could go ***from 364,000 pounds per year to 5.2 million pounds per year***. *See* <https://www.aphis.usda.gov/brs/aphisdocs/dicamba_feis_appendices.pdf>.

145.    Defendants affirmatively engaged in jointly established stewardship guidelines, best management practices, application schools and techniques. Defendants entered contractual agreements and created special relationships by interacting with farmers to obtain their trust through instructing and controlling the means and methods by which dicamba-herbicides are sprayed through proprietary stewardship guidelines, best management practices, superior knowledge and On-Target Application Academies (OTAA).  All of which were programs implemented to "teach growers how to minimize drift and make applications of low-volatility Engenia herbicide safe, accurate and effective" and to educate, train, and instruct farmers who purchased the dicamba seeds, creating a direct, special relationship with the farmers who bought the dicamba-tolerant crop system.

### D.    DEFENDANTS' REPRESENTATIONS TO THE PUBLIC

146.    Defendants have made numerous representations of material fact to the public about their dicamba-tolerant crop system and its use, intended purpose, and safety.

147.    "The dicamba-based herbicide and dicamba-tolerant seed technology were specifically designed for their intended purpose to be used in conjunction with one another as a cropping system," as BASF states, Engenia was "[d]eveloped specifically for dicamba-tolerant cropping systems, Engenia™ herbicide." – Engenia Pre-Registration Brochure for Soybeans.

148.    "We made the decision early on that Engenia was being developed specifically for use in the dicamba-tolerant cropping system. So, we approached the regulatory process from that angle," said Luke Bozeman, BASF technical market manager with Engenia responsibilities. "Engenia has been developed specifically for over-the-top use in dicamba-tolerant soybeans and cotton, and it made the most sense not to broaden the availability to the market place in other areas where the overall stewardship effort could possibly be diluted.".

149.    "We are aligned with BASF on the majority of things, and our regulatory pieces are obviously in check as we look at weed resistance management ***in trying to have on-target applications***." - Ty Witten, North American Crop Protection Systems Lead with Monsanto.

150.    "We are committed to providing farmers with the weed management tools they need to be successful," said Robb Fraley, Monsanto's chief technology officer. "Our work with BASF brings us one step closer to bringing more improved weed control offerings to farmers. We expect the formulations to be an excellent complement to Monsanto's dicamba tolerant seed technologies when they are brought to market."

151.    According to a joint press release of BASF and Monsanto, in November 2010, Monsanto and BASF published favorable results of joint field testing of new dicamba-based formulations with Monsanto's next-generation dicamba tolerant soybeans. The new formulations demonstrated excellent weed control ***and crop safety.***

152.    BASF, the world's leading chemical company, and Monsanto, the world's leading agriculture technology company, a joint licensing agreement to develop innovative formulations for dicamba for use with dicamba herbicide-resistant cropping systems in January 2009. - <http://www.prnewswire.com/news-releases/basf-and-monsanto-take-dicamba-tolerant-cropping-system-collaboration-to-the-next-level-117927054.html>.

153.    Further, on November 2, 2010, in a BASF and Monsanto joint press release, both parties affirmatively warrantied, "This new formulation work offers even further improvement in physical characteristics that ***result in better performance and safety to nearby crops***." - <http://news.monsanto.com/press-release/basf-and-monsanto-announce-progress-dicamba-formulations>.

154.    "Successful adoption of the dicamba tolerance trait, into the Roundup Ready® soybean system, will provide: 1) growers with an opportunity for an efficient, effective weed management system; 2) an option to delay or prevent further resistance to glyphosate and other critically important soybean herbicides, in particular, herbicides in the ALS and PPO class of chemistry; ***3) excellent crop safety***, and 4) continue to provide soybean growers with effective weed control systems necessary for production yields to meet the growing needs of the food, feed, and industrial markets." – Monsanto Environmental Protection Agency Petition for 87708 (Xtend Soybean).

155.    In addition to the warranty, assurance and promise of "excellent crop safety," similar representations were made by Defendants regarding volatility and drift, the two greatest concerns of off-target movement of the inherently dangerous dicamba-based herbicides, which causes damage to sensitive (non-dicamba-tolerant) crops.

### a.    BASF Representations Regarding Volatility and Drift.

156.    Through its agents and representatives, BASF admitted, "There were two critical triggers that were looked at and identified as necessary for Engenia. One of those was maintaining the efficacy of dicamba. We didn't want to lose any of the benefits of the herbicide. The second one was reduction in overall volatility of dicamba and what we tend to call secondary drift or movement. Some off-target movement can be confused with volatility even though it is not a true chemical definition of volatility." – Luke Bozeman, BASF technical market manager with Engenia responsibilities.

157.    Yet, BASF continually represented to the consumers, users, and farmers that Engenia's reduced volatility made it a safe, reliable, corresponding herbicide to be used in the dicamba cropping system, "Engenia herbicide has a positive environmental and toxicological

profile. ***On-target application is also greatly enhanced***…" - Engenia Pre-Registration Brochure for Soybeans.

158.    "The introduction of dicamba tolerant crops combined with improved dicamba formulations will provide farmers the tools they need to combat the yield-robbing weed resistance some are facing in their fields today," said Markus Heldt, President of BASF's Crop Protection Division. "Since the introduction of Clarity® in 1992, BASF has continually improved its dicamba offerings. ***Our next generation products will offer yet another step change in volatility reduction*** while maintaining the highest level of weed control. The system, along with proper stewardship measures, ***will ultimately deliver peace of mind for growers***."

159.    According to BASF: "Field research demonstrates on-target herbicide application success with ***low volatility*** and drift, so ***the herbicide remains in place***." - <http://agproducts.basf.us/campaigns/engenia>.

160.    "Advanced formulation ***reduces loss from volatility***." - Engenia Pre-Registration Brochure for Soybeans.

161.    "Although the potential for dicamba ***volatility is low***, the Engenia herbicide formulation was ***developed to further minimize secondary loss due to volatilization***." - Engenia Pre-Registration Brochure for Soybeans.

162.    "An advanced formulation, with a ***70 percent reduction in volatility*** when compared to DGA dicamba." - <http://www.agproducts.basf.us/news-&-events/press-releases/current-press-releases/2016-engenia-herbicide-from-basf-now-registered-by-epa.html>.

163.    "BASF studies of Engenia herbicide indicate superior weed control and crop tolerance, and show that the product will:

(a)    Be more effective than 2,4-D for residual control of key broadleaf weeds, including waterhemp, common lambsquarters and Palmer amaranth.

(b)    Provide effective post-emergence control of many broadleaf weeds, including smartweed, kochia and cocklebur, as well as superior control of perennial weed Canada thistle compared to 2,4-D.

(c)    Deliver more than 95 percent control of both grasses and problematic broadleaf weeds when combined with a BASF residual herbicide." - <https://www.basf.com/us/en/company/news-and-media/news-releases/2016/12/P-US-16-251.html>.

164.    "Engenia has done great in all of our tests that we use to measure secondary loss parameters – all the way from the laboratory to field testing using vacuum pumps and air collection devices. There is a ***significant reduction in any secondary loss profile compared to other dicamba formulations***." - Luke Bozeman, BASF technical market manager with Engenia responsibilities.

165.    "We can positively impact the volatility profile with formulation, which we've done with Engenia. But once the product is delivered to the persons applying it, then we want to make sure they have all the tools necessary and all the knowledge necessary to make an application that does not allow any spray drift onto their neighbors' crops." - Luke Bozeman, BASF technical market manager with Engenia responsibilities.

166.    "Innovative formulations with proven chemistries are an invaluable asset for weed resistance management and a cornerstone of sustainable agriculture," said Markus Heldt, President of BASF's Crop Protection Division. "The dicamba tolerant system is designed give

growers pre- and post-emergence application flexibility, allowing them to better manage their resources and thus improving productivity," he added.

167.    "Our innovative and expansive product portfolio is **designed to provide you with crop protection** that gives you a business edge." – <http://www.agproducts.basf.us/>.

168.    "**Beyond protecting your crops, we help you get smarter about the risks you face so you can protect your business and bottom line**." – <http://www.agproducts.basf.us/>.

169.    On April 10, 2012, Paul Rea, Vice President of BASF's Crop Protection Division, made the following representation, "Farmers fighting herbicide resistance have an important new tool in Engenia which, field research shows, will offer excellent weed control and ***crop safety, as well as low-volatility characteristics for improved on target application***."

170.    In a 2012 interview with Reuters, Markus Heldt, President of BASF's Crop Protection Division, stated, "The newly formulated herbicide has ***minimized volatility***…We are a responsible company…Dicamba is well known. It has been on the market of 50 years. We are not playing with a chemistry that is dangerous." The Defendants represented this "new formulation" of dicamba as safe, and also investigated and represented it as safe to nearby crops, has excellent crop safety, and is safe to the environment. These representations by the Defendants are misleading because of what is not being said about their new product. The facts are dicamba has never been used for in-crop, over-the-top use on soybeans and the Defendants new application system requires significant amounts of dicamba sprayed throughout the growing season in multiple applications. Before Defendants' technology, dicamba was typically applied one time, either pre-emergent or post-harvest, and never in-crop, over-the-top on soybeans. The new formulation as represented for in-crop use necessitates a substantial increase in volume of dicamba, which exposes much more acreage and farm crops to damage and injury than ever

before. In fact, the EPA was concerned about creating "super weeds" resistant to dicamba because of the massive introduction of dicamba into the crop system. The Defendants omitted this material knowledge and impact on the Tennessee environment from Plaintiffs.

171.    These representations should be put in context with the knowledge and conduct of Defendants.  Defendants, recognizing the need for the massive increase in supply for farmers, had a plan to complete their crop system. In 2014, BASF stated, "We foresee a peak sales potential of €2,300 million for these products, which represents an increase of €200 million compared with the previous year."

172.    BASF further announced, "The expansion supports the company's strategy to increase the production volumes of dicamba, ensuring growers have access to the latest technologies for better weed management programs. For the expansion, BASF invested more than $270 million, making it BASF's largest investment ever in facilities for agricultural products." In 2016, Monsanto's Board of Directors approved an investment of slightly lower than $1 billion in a plant in Luling, Louisiana to expand the drop system and the dicamba herbicides recognizing the planned need to supply the massive increase of dicamba demanded due to the new crop system.

### b.    Monsanto Representations Regarding Volatility and Drift

173.    "We are committed to providing farmers with the weed management tools they need to be successful," said Robb Fraley, Monsanto's chief technology officer.

174.    "Our work with BASF brings us one step closer to bringing more improved weed control offerings to farmers. We expect the formulations to be an excellent complement to Monsanto's dicamba tolerant seed technologies when they are brought to market." said Robb Fraley, Monsanto's chief technology officer.

175.    "Various dicamba formulations have been developed over time to **help reduce potential volatilization** while delivering improved weed control and **greater application flexibility. Dicamba has a decades-long history of effective use in the U.S.** and 25 other countries in corn, wheat, fallow and pasture land; on conservation tillage acres; and for residential lawn care." - <http://news.monsanto.com/press-release/corporate/monsanto-and-dupont-sign-dicamba-supply-agreement>.

176.    However, the effectiveness of the prior formulations was always for pre-emergent and post-harvest uses as a burndown application, not an in-crop, over-the-top, use.

177.    "BASF has a proven track record of bringing innovative formulation technologies to the market that improve the effectiveness and environmental profile of crop protection products." - <http://news.monsanto.com/press-release/basf-and-monsanto-formalize-agreement-develop-dicamba-based-formulation-technologies>.

178.    Monsanto advertised its VaporGrip technology, which is featured in both Xtendimax and Fexapan, as "A Revolutionary Breakthrough" that "provides growers and applicators confidence in on-target application of dicamba".

179.    Xtendimax was advertised as 90% less volatile than Clarity, and exponentially less volatile than Banvel.

### c.    DuPont Representations Regarding Volatility and Drift

180.    Dupont promised that Fexapan offered "better weed management with less worry about dicamba volatility" and touted that VaporGrip technology prevents the formation of "the volatile form of dicamba in the spray droplet" and minimizes off-target movement after spraying.

### E.    DEFENDANTS KNEW OR SHOULD HAVE KNOWN THE DANGEROUS VOLATILITY OF DICAMBA AND SUSCEPTIBILITY OF HIGHLY SENSITIVE NON-DICAMBA-TOLERANT CROPS

181.    It is critical to note that the EPA only conducts drift models when determining risks in the registration of an herbicide because volatilization is too difficult to model (US EPA 2005); although, it is an acknowledged, recognized hazard. The European Food Safety Authority states volatility is as a "Critical area of concern" for dicamba use: "[d]icamba has the potential for long-range transport through the atmosphere." (EFSA 2011, p. 14).

182.    Contrary to prior representations of safety, Defendants know and acknowledge problems with dicamba-tolerant crop system damage to neighbor crops, such as the Plaintiffs, and similarly situated class members.

183.    Commenting on state plant board complaints of dicamba damage due to volatile off-target vapor movement, Ty Witten, North American Crop Protection Systems Lead with Monsanto responded, "***This isn't a new phenomenon. It's not unexpected*** that we would hear some grower challenges and complaints. That happens with these types of chemistries, whether we're talking 2,4-D or dicamba. The symptomology with these is different than with glyphosate or glufosinate, because of the unique symptomology that a growth regulator provides on an auxin-type chemistry. People can point to it and say, 'That's what it must be; it must be that new dicamba,' whereas glyphosate injury or others could just look like general crop stress."

184.    "Even though Monsanto has provided and what the science shows is the lowest volatility product out there, you can have environmental conditions that create inversions, or a potential for volatility. These things happen even as early as mid-afternoon to early evening. If you start to apply herbicides at nighttime or really early in the morning, especially in and around some of these." - Ty Witten, North American Crop Protection Systems Lead with Monsanto.

185.    "After reviewing submitted data relating to the volatility of dicamba, and at the time the EPA proposed these new uses, the agency had concerns regarding the volatility of

dicamba and possible post-application, vapor-phase off-site transport that might damage non-target plants. Monsanto responded to these concerns with an additional submission post-proposal that acknowledged the long-recognized volatility of dicamba acid and described measurements of the volatilization in the different formulations." -Final Registration on Xtendimax

186.    In the registration comments period, the dangers of dicamba volatility and the sensitivity of non-dicamba-tolerant crops were made abundantly clear. The Center for Food Safety wrote, "Properties of dicamba make it a much greater threat than glyphosate. Like most auxin herbicides, dicamba has very broad-spectrum activity on broadleaf plants, which include cotton and soybeans as well as nearly all vegetables and fruits. *Auxin herbicides are also very potent, dicamba more so than 2,4-D, such that very low drift-level doses can cause considerable damage*. Finally, while most herbicides pose a drift threat only during their initial application, *dicamba is extremely volatile, and is known to volatilize from plant surfaces days after the initial application to move off-target and cause damage to crops and wild plants at considerable distances*."

187.    The EPA had likewise expressed similar concerns of the inherently dangerous volatility of dicamba in the past, where it stated, "Dicamba is a particularly potent poison for many species of plants, especially dicotyledons (dicots, or broadleaf plants) that are sensitive to very low drift levels and to dicamba- contaminated water in semi-aquatic areas." (US EPA 2006) p. 18 – 19.

188.    "Dicamba has proven itself to move off-target and cause injury and yield reductions to soybeans and so in a large sense, it is rarely used." Steve Smith, the Director of Agriculture at Red Gold, an Indiana Tomato Based Processor.

189.    The Save Our Crops Coalition echoed drift and volatility concerns in the comment period of the EPA registration, stating, "A survey of state pesticide control officials listed dicamba as the pesticide third most commonly involved in drift incidents for two years in a row."[2] This is incidence of drift damage far outpaces the relative use of dicamba.

190.    Non-target plant damage associated with herbicide spray drift and volatilization is a major concern for specialty crop growers and processors. Credible estimates project significant increases in the amount of dicamba that will be applied upon the introduction of dicamba tolerant crops. Dicamba, because of its potential to drift and volatilize, has proven to be one of America's most dangerous herbicides for non-target plant damage. –  Save Our Crops Coalition ("SOCC") Final Comment.

191.    To misdirect the well-known concerns of dicamba volatility, Defendants suggest their field trials, which included field testing in Monmouth, Illinois, support mass introduction of a known hazardous herbicide as an over-the-top application for dicamba-tolerant crops. However, this subterfuge Defendants ignores critical facts.

192.    Defendants knew that data produced from field testing in Monmouth, Illinois is not applicable to the temperatures and humidity seen in the mid-south and other areas.

193.    As University of Arkansas weed scientist, Tom Barber, accurately stated, "We're just unsure if these new Monsanto VaporGrip formulations have been tested in a 'MidSouth way," says Barber. "Data from somewhere else, Texas or the Midwest, just doesn't translate here. Just because it works in Illinois and Indiana doesn't mean it'll do the same here."

194.    University of Arkansas weed scientist, Jason Norsworthy, continued with speculation of Defendants' field testing because it couldn't properly collect data applicable to the

---

[2] *2005 Pesticide Drift Enforcement Survey Report*, Association of American Pesticide Control Officials (2005), available at http://aapco.ceris.purdue.edu/doc/surveys/DriftEnforce05Rpt.html

mid-south, where he accurately stated, "Think about the environmental conditions here," says Norsworthy. "Think about the wind speeds, the temperature swings, the humidity and all the rest. Tom's right: all of that will have an impact on off target movement. Just because the formulation was successfully evaluated in Nebraska or northern Iowa, who cares?...."

195.    The inherent temperature and humidity risks of dicamba volatilization have been reported as early as 1979, when after a series of field and glasshouse experiments, Behrens and Lueschen reported, "[T]hat dicamba volatilizing from treated corn could be detected via effects on soybeans for three days after the application; and that dicamba volatilization was enhanced by higher temperatures and lower humidity…"

196.    The inherent susceptibility of sensitive, non-dicamba tolerant crops compounds the ultimate risk of the inherently dangerous volatility of dicamba vapor moving and causing damage to off-target crops.

197.    As accurately stated by University of Arkansas weed scientist, Tom Barber, "Soybeans are extremely sensitive to dicamba, so just a small amount will produce visual symptoms."

198.    Similarly, University of Illinois weed scientist, Aaron Hager, noted, "It doesn't take much of dicamba to cause damage to sensitive crops and we have a lot of sensitive crops to consider. Having a reduced-volatility formulation does not eliminate physical drift…"

199.    Dicamba has proven especially prone to cause damage. Sciumbaro, Audie S., et al. *Determining Exposure to Auxin-Like Herbicides. I. Quantifying Injury to Cotton and Soybean, Weed Technology*, Vol. 18, 1125-1134 (2004).

200.    Further, University of Georgia weed scientist, Stanley Culpepper, gathered data on crops for five years on which specialty crops (and row crops) suffer serious visual damage when small amounts of dicamba and 2,4-D drift onto them.

201.    Culpepper divided the herbicide sensitivity of crops into four groups: lower sensitivity crops (visually detectable injury symptoms when exposed to more than 1/75 the labeled rate); moderate sensitivity (1/75 to 1/300 the labeled rate); severe sensitivity (1/300 to 1/800 the labeled rate) and extreme sensitivity (less than 1/800 the labeled rate).

202.    Dr. Culpepper recorded the following findings for dicamba sensitive crops:

- Extreme sensitivity: grapes, lima beans, Southern peas, snap beans, soybeans, sweet potatoes and tobacco

- Severe sensitivity: cotton, pepper, tomato and watermelon.

- Moderate sensitivity: cantaloupe, cucumber, peach, peanut and squash.

- Lower sensitivity: broccoli, cabbage, kale, mustard, pecan and turnips.

203.    Dr. Culpepper recorded the following findings for 2,4-D sensitive crops:

- Extreme sensitivity: cotton, grapes, sweet potatoes and tobacco.

- Severe sensitivity: pepper, tomato and watermelon.

- Moderate sensitivity: cantaloupe, canola, cucumber, peaches, peanut, pecan and squash.

- Lower sensitivity: broccoli, cabbage, kale, mustards, onion and turnips.

204.    In a similar study, Researchers at the Ohio State University Department of Horticulture and Crop Science conducted a study on the effect of simulated dicamba drift and volatilization on tomatoes grown for processing.  Their objective was to quantify the impact of low rates of dicamba on broadleaf crops.

205.    According to Researchers at the Ohio State University Department of Horticulture and Crop Science, simulated dicamba drift and volatilization caused tomato bloom to "abort."

206.    Applications of dicamba at levels as low as 1/300th of the soybean field rate caused statistically significant losses of tomato crops. The late drift of dicamba, during bloom, caused a 17-77% reduction in marketable fruit when applied at 1/100th of the field rates with respect to plant injury and the potential for yield losses.

207.    Notably, tomatoes are less sensitive to dicamba than soybeans and tobacco and roughly, equally as sensitive to dicamba as cotton.

208.    By jointly researching and developing dicamba-resistant seeds and dicamba-based weed control products, Defendants' knew dicamba is inherently volatile and can directly harm non-dicamba tolerant crops.

209.    The new formulation and dicamba-tolerant crop system implemented by Defendants has directly harmed Plaintiffs, and others similarly situated, whose crops are left in a several mile-wide danger zone surrounded by farmers who purchase Defendants' dicamba-tolerant crop system. Plaintiffs and other Tennessee growers similarly situated are left financially devastated by this inherently volatile and dangerous crop system falsely represented as safe.

## F.    DEFENDANTS' PLAN TO FLOOD THE MARKET

210.    Upon information and belief, Monsanto and about 100 licensees targeted sales on more than 3 million acres of soybeans and discounted sales by $5 per unit across Monsanto brands in an attempt to compensate for lack of a dicamba herbicide option in 2016. *See* http://agfax.com/2016/04/01/monsanto-basf-dicambia-herbicides-start-epa-public-comment-period-dtn/

211.    Monsanto's discounted sales in 2016 were an effort to flood the market with a seed technology that could damage every other seed technology on the market in order to control and dominate the soybean and cotton markets with conscious, reckless disregard of the consequences.

212.    In a rush to the marketplace with their new, but still, unsafe, inherently and unreasonably dangerous formulation, Defendants sold the system and causing nearby farms to either buy Defendants' products in defense or face financial ruin because crop damage due to off-target herbicide movement.

213.    Due to the massive profits and market dominance of the dicamba-tolerant crop system, Defendants continued their wrongful conduct directed toward the Plaintiffs, and others similarly situated, because of their control of the dicamba-herbicide and dicamba-resistant seed market, suppressing, concealing and omitting information regarding the volatile and injurious nature of their products from Plaintiffs while knowing the harm that Defendants' products could cause to Plaintiffs.

214.    Defendants' scheme and overall conspiracy to control the cotton, soybean, and dicamba herbicide markets, while concealing, omitting and suppressing material facts of the dangers of its product to Plaintiffs, resulted in significant harm, which Defendants knew would result.

215.    Defendants' dicamba-tolerant crop system resulted in Defendants gaining an increased market share in the soybean and cotton market in Tennessee and other states.

216.    Monsanto willfully, wantonly, knowingly and negligently violated the industry practice and legal standards by releasing the dicamba-tolerant crop system on the market without a safe herbicide.

217.    Because of Defendants' overarching and predominating wrongful conduct knowing that through their control of the agricultural process involving dicamba-resistant seeds and herbicides, Defendants deceptive, negligent, and fraudulent trade practices by negligently releasing its dicamba-tolerant crop system has caused damage to thousands of acres of farmland and caused millions of dollars of damage to Tennessee farmers, including Plaintiffs.

## G.    CONSEQUENCES IN CROP YEAR 2017

218.    Consistent with the long-standing, well-known inherent dangers with dicamba, neighboring, off-target, sensitive crops in Tennessee experienced and continues to experience massive crop damage in 2017.

219.    For this Crop Year, the Tennessee Department of Agriculture has received multiple complaints of damage due to off-target dicamba movement in 2017.

## V.    CLASS ACTION ALLEGATIONS

220.    Plaintiffs bring this action on behalf of themselves individually and as a class action in the State of Tennessee pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following defined class (the "Class"):

> All agriculture farmers and entities who raise non-dicamba-tolerant crops and suffered damage to those crops as a result of Defendants' conspiracy and wrongful conduct or co-conspirators, or from any predecessors, parents, subsidiaries, or affiliates thereof, between 2015, and the present. Excluded from the Class are Defendants, co-conspirators, parent companies, predecessors, subsidiaries and affiliates, and all governmental entities.

221.    The requirements of Rule 23(a) are satisfied for each of the foregoing Classes because the members of each Class are so numerous and geographically dispersed that joinder of all its members is inapplicable.  In Tennessee, the number of acres of soybeans planted and harvested for grain in Crop Year 2015 was approximately 1,700,000 acres.  Although the exact

number and identity of each Class member is not known, there are hundreds, if not thousands, of members in each Class.  The "numerosity" requirement of Rule 23(a)(1) is, therefore, satisfied.

222.   The "commonality" requirement of Rule 23(a)(2) is satisfied because there are questions of law and fact common to each of the respective Plaintiffs and the other members of each of the Classes they respectively seek to represent.   Among those common questions of law and fact are:

a.    whether the members of the Class have sustained or continue to sustain damages in their business or property by reason of Defendants' acts or omissions;

b.    whether Defendants, through their acts or omissions, caused or contributed to cause the loss of yield for Tennessee farmers;

c.    whether Defendants knew or should have known that their acts or omissions would cause or contribute to cause the loss of yield for Tennessee farmers;

d.    whether the loss of yield for Tennessee farmers resulted in a loss of profit to Tennessee farmers;

e.    whether Defendants are legally responsible for the loss of yield for Tennessee farmers under one or more of the legal theories asserted in this complaint;

f.    whether the members of the Class have sustained and continue to sustain damage as a result of Defendants' wrongful conduct, and if so, the proper measure and appropriate formula to be applied in determining such damages for the Class; and

g.    whether the members of the Class are entitled to compensatory, statutory, exemplary, and/or punitive damages.

223.   Furthermore, the relief sought by the Plaintiffs is common to the entire class.  Judicial rulings in one lawsuit would resolve major legal questions of fact and law, including common defenses in one stroke, including inherent defect of the product and

conspiracy to engage in unlawful conduct, which arise from predominating, overarching legal questions that may be decided in one lawsuit regarding Defendants' conduct, which is common and predominates toward all affected Plaintiffs over any individual issues.

224.    Furthermore, consolidating the judiciary rulings in this lawsuit would determine the corporate conduct by Defendants, which is uniform and harmed all Plaintiffs.  Each Plaintiff was harmed by the co-conspiracy alleged herein and the resulting premature release of the volatile and inherently dangerous dicamba-tolerant crop-system.

225.    In addition to the commonality as outlined above, numerous questions of fact or law arise from the unlawful conduct of Defendants' and their co-conspirators', which is common, overarching and predominating to the class, including but not limited to:

a.    Whether Defendants and their co-conspirators combined or conspired to control the non-dicamba-tolerant crop market and supply dicamba harmful to non-dicamba tolerant crops;

b.    Whether Defendants and their co-conspirators engaged in unfair, false, deceptive or unconscionable behavior;

c.    Whether Defendants' and their co-conspirators' conduct toward Plaintiffs and the Class was false, deceptive and unconscionable;

d.    Whether Defendants and their co-conspirators were unjustly enriched by the sale of dicamba, which harmed Plaintiffs;

e.    Whether Defendants should make restitution to the Class for damages suffered from Defendants' crop-system;

f.    Whether the Plaintiffs and Class were injured by Defendants' and their co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members;

g.    Whether Defendants and their co-conspirators were negligent by developing, formulating, marketing, and selling an inherently dangerous crop system;

h.      Whether Defendants had a legal duty to innocent parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm from their inherently dangerous crop system;

i.       Whether Defendants suppressed, concealed or omitted material facts, as part of their agency, partnership, joint-venture or joint enterprise scheme and device, regarding the volatility to farmers or entities who did not purchase their products;

j.       Whether Defendants were unjustly enriched at the expense of Plaintiffs;

k.      Whether the Plaintiffs and Class are entitled to injunctive relief;

l.       Whether class punitive damages should be imposed upon Defendants for their reckless or corporate conduct, which was engaged in a pursuit and course of action, which Defendants knew or should have known would harm Plaintiffs.

226.    The questions of fact and law common to the Class are overarching and predominate as a threshold matter over any individual questions affecting members of the Class.

227.    Plaintiffs' claims are typical of the claims of all other members of the Class that they seek to represent, as described above, because they arise from the same course of conspiracy and unlawful conduct by Defendants and are based on the same legal theories as do the claims of all other members of the Class.  Moreover, Plaintiffs seek the same forms of relief for themselves as they do on behalf of absent Class members.  Accordingly, Plaintiffs have satisfied the "typicality" requirements of Rule 23(a)(3) with respect to the Class they respectively seek to represent.

228.    Because their claims are typical of the respective Class that they seek to represent, Plaintiffs have every incentive to pursue those claims vigorously.  Plaintiffs will fairly and adequately represent the interests of the Class and have no conflicts with, or interests antagonistic to, the Tennessee farmers compromising the other members of

the Class they respectively seek to represent relating to the claims set forth herein. Also, Plaintiffs' commitment to the vigorous prosecution of this action is reflected in their retention of competent counsel experienced in agriculture, toxic torts, class action and complex litigation to represent them and the other members of the Class. Plaintiffs' counsel will fairly and adequately represent the interests of the Class, and have identified and thoroughly investigated the claims set forth herein; are highly experienced in the management and litigation of class actions and complex litigation; have extensive knowledge of the applicable law; and possess the resources to commit to the vigorous prosecution of this action on behalf the proposed Class. Accordingly, Plaintiffs satisfy the adequacy of representation requirements of Rule 23(a)(4) with respect to the proposed Class.

229.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the class as a whole.

230.    A class action is procedurally superior to any alternatives for adjudicating the claims of the Plaintiffs and members of the Class. The claims of the members of the Class are small and can be consolidated into one lawsuit to decide the predominating issue of liability. Permitting this lawsuit to proceed utilizing the class mechanism will eliminate multiple litigation over the same common issues of fact and liability and the probability of and risk of inconsistent decisions establishing varying standards of conduct for the Defendants.

231.    This action additionally meets the requirements of Rule 23(b)(3). Common questions of law and fact, including those enumerated above, exist as to the claims of all members of the Class and predominate over questions affecting only individual Class members, and a class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit large numbers of similarly-situated persons to

prosecute their respective class claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Furthermore, while damages to members of the Class are substantial in the aggregate, the damages to any individual member of the proposed Class may be insufficient to justify individually controlling the prosecution of separate actions against Defendants.

232.    This case is manageable as a class action, and a class trial will be manageable. Notice may be provided to members of the Class by first-class mail and through alternative means of publication and the Internet.

233.    To the extent not all issues or claims, including damages, can be resolved on a class-wide basis, Plaintiffs invoke Rule 23(c)(4) and reserve the right to seek certification of narrower and/or re-defined Class and/or to seek certification of a liability class or certification of certain issues common to the class.

234.    Finally, maintenance of the lawsuit as a class action will promote judicial economy, efficiency and fairness to all parties involved.

## VI.    <u>TRADE AND COMMERCE</u>

235.    During the relevant time periods alleged herein, the Defendants, their agents, joint-venturers, joint enterprise, partners and co-conspirators engaged in wrongful and unlawful conduct and control of the dicamba market affecting trade and commerce throughout the fifty (50) states, including this judicial district.

236.    Entities or agents not named as Defendants have directly participated in the unlawful conduct and conspiracy alleged herein and have performed acts and made statements in furtherance thereof.

237.    While actively engaged in the management, direction or control of its affairs, each of the co-conspirators performed each of the acts alleged herein, or alternatively, each co-conspirator authorized or ordered duly authorized officers, agents, employees or representatives to perform said acts.

238.    Defendants are liable for unlawful acts performed in furtherance of the alleged conspiracy by companies acquired through mergers and acquisitions.

## VII.    CAUSES OF ACTION

### A.    FIRST CAUSE OF ACTION - STRICT PRODUCTS LIABILITY
### (T.C.A. § 29-28-101, *et seq.*)

239.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.  Pursuant to the Tennessee Products Liability Act of 1978, T.C.A.. § 29-28-101, *et seq.* , a manufacturer or seller of a product is liable for harm to another person or his property if: (1) The manufacturer or seller is engaged in the business of manufacturing selling, or distributing the product; (2) The product was supplied by him in a defective condition that rendered it unreasonably dangerous; and (3) The defective condition was a proximate cause of the harm to person or to property.

240.    Defendants have a partnership, joint-venture and joint-enterprise for the dicamba-crop system for supplying to the marketplace in Tennessee, and other states, genetically modified seeds represented as dicamba-tolerant, which require a compatible dicamba-tolerant herbicide associated with the same genetic traits.

241.    Each of the Defendants is engaged in the business of variously manufacturing, selling, and distributing the dicamba-tolerant crop system and is a " seller" and "manufacturer" of the dicamba-tolerant crop system for the purpose of section 29-28-102 of the Tennessee Code.

242.    The Defendants supplied defective seed and herbicide products in a dicamba-tolerant crop system that cannot be used in a safe manner, which prevents injury to non-target crops.

243.    The Defendants supplied defective dicamba-tolerant crop system in a defective condition that rendered their products unsafe and unreasonably dangerous and exposed innocent third parties' crops to an unsafe, inherently dangerous and volatile herbicide.

244.    The Defendants supplying defective dicamba-tolerant crop system was a proximate cause of the harm to Plaintiffs.

245.    Each Defendant is strictly liable for all damages to each plaintiff proximately caused by their defective dicamba-tolerant crop system.

## B.   SECOND CAUSE OF ACTION - NEGLIGENCE
### (T.C.A. § 29-28-101 et seq)

246.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

247.    Negligent Design and Formulation:  Each of the Defendants has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm.  Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed in the subject area.  Each of the Defendants, therefore, failed to use ordinary care in the design and selection of materials and formulation in its products.  The negligent design and selection of materials was a proximate cause of the harm to Plaintiffs.  The dicamba products sold by Defendants were so inherently dangerous to neighboring non-dicamba tolerant or resistant crops as to be unsafe for distribution and use in Tennessee.  Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

248.    <u>Negligent Testing</u>:  Each of the Defendants had an affirmative, non-delegable duty to test its products alone and in combination with dicamba-containing products that each of the Defendants recommended be used in order to determine the extent to which drift would injure off-target crops, and to provide such instructions and take other appropriate measures as are necessary to prevent such drift injuries.  Each of the Defendants failed to adequately test its products or to take appropriate steps to prevent such damage.  Each of the Defendants' negligent testing was a proximate cause of the harm to Plaintiffs.  Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

249.    <u>Inadequate Warning, Instruction, and Training</u>:  Defendants have a non-delegable duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the product and to provide such instructions as are necessary to permit the reasonably safe use of the product.

250.    Defendants sold their dicamba-tolerant crop system to farmers knowing that herbicides could not be safely used and there was a significant and imminent disastrous risk to neighbors' crops, which were not dicamba-tolerant.

251.    Each of the Defendants jointly failed to provide adequate, warning, training and instruction of dangers inherent with its dicamba-tolerant crop system.

252.    Each of the Defendants violated its affirmative duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, migration and drift of dicamba-containing products in amounts that cause severe damage to crops other than those grown from dicamba seeds.

253.    Likewise, none of the product labels contain instruction for use that would, if followed, make it possible to use the dicamba seeds with a reasonable expectation that harm to collateral non-target crops would not be harmed.

254.    The inadequate warnings were a proximate cause of the harm to Plaintiffs. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

255.    In addition to the foregoing negligence, the Defendants were negligent in distributing and selling dicamba seeds to the other Defendants without warning them of the impropriety of suggesting the use of dicamba-containing products without limitations or modifications to make its use reasonably safe or without agreed restrictions on the products use so as to avoid it being sold into an area at a time where harm to sensitive crops would be likely to occur.

256.    Furthermore, Defendants were further negligent in their failure to provide adequate education, information, instruction and products for their dicamba-tolerant crop system knowing that it was released without adequate testing and knowing of the inherent danger and volatility of its product once released in the market and used by neighboring crops, such as Plaintiffs.

257.    The distributing Defendants were negligent in selling their dicamba-tolerant system in the subject area given that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given the physical proximity of the two crops, time of use, and the history of crop damage occurring in the area from the use of dicamba-containing products.

258.    Defendants had an affirmative obligation to properly and fully train, educate, inform, and instruct farmers, including full disclosure of the vast, expansive nature of the spraying operation and campaign waged on palmer amaranth ("pigweed").

259.    Defendants were negligent in their training, supervision, education, curriculum, information, demonstrations, testing, instructions, omissions, actions, and conduct, in implementing their dicamba-tolerant crop system in Tennessee. Defendants knowingly and negligently withheld or omitted critical information from consumers, which caused significant damage to innocent third-parties, including Plaintiffs.

260.    Defendants negligently released a new formulated dicamba system without proper distribution, training, education, information, demonstration and teaching.    Defendants completely occupy the dicamba-tolerant crop system in Tennessee and the training for the safe and responsible use of their dicamba products.

261.    Farmers who purchased the Defendants' dicamba products "were conscientious about their responsibilities in connection with the use" of Defendants' products. According to Robb Fraley, the Chief Technology Officer of Monsanto, farmers "knew all about the application requirements to help minimize any risk of off-target movement, and many told me they'd attended one or more of the learning events where we've hosted nearly 50,000 custom applicators, grower applicators and other key stakeholders at venues across the country."

262.    However, Defendants failed to properly teach, train, and instruct their application requirements to farmers regarding their dicamba training system at on-target application academies. The necessity for on-target application training for their dicamba-tolerant products was magnified by the massive distribution and dispersion of their product in Tennessee without proper instruction and disclosure of the hazards of the new formula to farmers.

263.    Defendants have superior, intricate, proprietary knowledge of the dangers and risks associated with Defendants' products, which were unavailable to the public, consumers, and farmers. Defendants have a non-delegable to duty to sell and distribute a safe crop system. BASF represents it has "a very knowledgeable and experienced staff of experts in on-target applications of dicamba."

264.    Defendants failed to conduct sufficient training, education, supervision and demonstrations to all farmers who purchased their dicamba-tolerant crop system, thus, imminently exposing nearby crops to damage regardless the degree of care.

265.    Defendants have a non-delegable duty owed to farmers who buy the dicamba system to prevent harm to neighbor's crops, including Plaintiffs.  Defendants have a non-delegable duty to properly distribute, train, educate, information, demonstration, supervise and teach the responsible use of their new dicamba formula.

266.    Defendants cannot delegate their knowledge and inherent risk with their product without proper distribution, training, education, information, demonstration and teaching. Defendants must supply proper educators, education, curriculum, training education, demonstrations, teaching and full disclosure of volatility to nearby crops.

267.    Defendants breached these affirmative non-delegable duties, responsibilities and obligations owed to the farmers who purchased their dicamba-tolerant products directly resulting in damage to Plaintiffs' crops.  Defendants further knowingly misrepresented the safety of their dicamba-tolerant products to nearby crops in representations made to farmers in Tennessee.

**C.    THIRD CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**
**(T.C.A. § 29-28-101 et seq)**

268.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

269.    Each of the Plaintiffs has sustained damage due to Defendants' unsafe, defective, inherently dangerous and volatile dicamba-tolerant crop system.

270.    Each Defendant knew that dicamba seeds would be used for the particular purpose of providing protection against dicamba-based herbicides.

271.    Each Defendant knew that farmers and the applicators who apply herbicides on behalf of farmers rely on the Defendants' skill and judgment to encourage the use of a suitable herbicide for weed control that will not damage off-target crops Tennessee, including adequate instructions and limitations on use, thereby impliedly warranting the product to be safe and suitable for that particular purpose.

272.    Defendants' products as designed, manufactured and labeled, were unsafe, inherently dangerous, not fit for the particular purpose for which they were required in that the product as designed, formulated and labeled posed an inherent risk to crops being grown in the region and the product therefore breached the implied warranty for fitness for a particular purpose rendering Defendants liable to Plaintiffs for their damages arising from such harm.

273.    The unsafe, volatility, inherent danger and unfitness of Defendants' products were a proximate cause of Plaintiffs' damages.

274.    Plaintiffs are people whom Defendants would reasonably have expected to be affected by their unsafe, dangerous, volatile and inherently dangerous dicamba-tolerant crop system.

### D.    FOURTH CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (T.C.A. § 29-28-101 et seq)

275.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

276.    A seller impliedly warrants that a product is merchantable at the time the product is sold.  To be merchantable, a product must be fit for the ordinary purposes for which the product is used, and the product must be adequately labeled and must conform to any promises or affirmations of fact made on the container or label.

277.    Each of the Plaintiffs has sustained damage due to exposure to Defendants unsafe, defective, volatile and inherently dangerous dicamba-tolerant crop system.

278.    Defendants sold dicamba-tolerant crop systems, which were not merchantable in that the product as designed, formulated, and labeled posed an unsafe and inherent risk to crops being grown in the region.

279.    The unfitness of Defendants' products was a proximate cause of Plaintiffs' damages.  Plaintiffs are people whom Defendants would reasonably have expected to be affected by Defendants unsafe, defective, volatile, and inherently dangerous dicamba-tolerant crop system.

**E.    FIFTH CAUSE OF ACTION – TENNESSEE CONSUMER PROTECTION ACT OF 1977 (T.C.A. § 47-18-101, *et seq.*)**

280.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

281.    Each of the Defendants is a "person" for the purposes of the Tennessee Consumer Protection Act of 1977 pursuant to T.C.A. § 47-18-103(13).

282.    Dicamba seeds and dicamba herbicides constitute "goods" within the meaning of T.C.A. § 47-18-103(7).

283.    Pursuant to T.C.A. § 47-18-104, it is unlawful for any person to use any deceptive fact or practice in connection with the sale or advertisement of property, such as dicamba seeds, and Defendants' herbicide.

284.    Pursuant to T.C.A. § 47-18-104(b)(5), it is unlawful for any person to knowingly make false representations as to the "sponsorship, approval, **characteristics**, ingredients, **uses**, **benefits** or quantities of goods.

285.    Pursuant to T.C.A. § 47-18-104(b)(7), it is unlawful in Tennessee to "represent[] that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another."

286.    Defendants engaged in unconscionable, false, and deceptive acts and practices in selling and labeling its product to imply that the product could safely be used in Tennessee, when each Defendant knew or should have known, if exercising ordinary care, that this was not the case.  Each Defendant also knew or should have known that the use of the product as labeled posed a risk to area crops that was beyond the control of the user, when following the label or other instructions.

287.    Defendants' customers, including Plaintiffs and members of the Class, were subjected to suppression, concealment and omission of material facts as a product of collusive, unlawful efforts by Defendants to control the market and suppress, conceal and omit from Plaintiffs, and others similarly situation, that their products posed a risk to area crops that was beyond the control of the user, when following the label or other instructions.

288.    As a result of Defendants' fraudulent concealment of their conspiracy and unlawful, unconscionable, false, fraudulent, unfair and deceptive conduct directed toward Plaintiffs, the running of any statute of limitations has been tolled with respect to any claims that

Plaintiffs and the Class members have as a result of the wrongful and unlawful conduct alleged in this complaint.

289.    Plaintiffs have a cause of action against each Defendant pursuant to T.C.A. § 47-18-101, *et seq.*, to recover their damages related to crop injury, as well as reasonable attorneys' fees.

### F.    SIXTH CAUSE OF ACTION - FRAUDULENT CONCEALMENT

290.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

291.    Before Defendants sold dicamba seeds, dicamba herbicide and their dicamba-tolerant crop system, and during the entire time of the sale, Defendants knew the inherently, unreasonable risks to third parties of herbicide spraying on neighboring non-dicamba tolerant crops and crop fields.  Further, Defendants were aware that by selling their dicamba-tolerant crop system, they were creating a situation in which their volatile herbicide would create imminent risk and harm to non-dicamba tolerant crops, thus, creating serious harm and financial ruin.

292.    Defendants misled Tennessee farmers by representing its dicamba-based herbicides are safe and provide safety to nearby crops when used for in-crop, over-the-top use.  However, put simply, there is no safe way to apply the Defendants' dicamba herbicide or any type of dicamba herbicide over-the-top without causing collateral damage to nearby crops that are not dicamba-tolerant.

293.    Farmers relied on Defendants to produce a safe and approved, corresponding herbicide that would be sold on the market in Tennessee.

294.    Defendants were long aware and on notice of the damages that would result to third parties because of their unsafe, defective, inherently dangerous, hazardous and volatile crop

system, yet despite this knowledge Defendants rushed their products to the marketplace knowing of the imminent harm Plaintiffs, and others similarly situated, faced with the introduction of their dangerous products to the marketplace.

295.    Moreover, despite the knowledge that its dicamba-tolerant crop products would cause imminent harm, Defendants affirmatively concealed these facts from farmers, federal and state regulatory bodies, farming associations, legislative bodies, the general public, and the Plaintiffs.

296.    The groups from which Defendants concealed these facts were unaware of the facts. Defendants also represented the safety of their products while knowing and suppressing the truth of the inherent volatility of their product and imminent danger to crops that were not tolerant to dicamba.

297.    The concealed information was material to all the groups described above.

298.    Defendants knew of the groups' ignorance of the truth and intentionally withheld the truth about dicamba-tolerant seeds, their Dicamba herbicide and their crop products' imminent risks to neighboring crops when released into the marketplace.

299.    As a result of the concealment of these facts, farmers purchased dicamba seeds and sprayed dicamba-containing herbicide, regulatory and legislative bodies were unable to protect the public, and Plaintiffs were harmed.

### G.    SEVENTH CAUSE OF ACTION - EXPRESS WARRANTIES BY AFFIRMATION, PROMISE, DESCRIPTION, OR SAMPLE (T.C.A § 29-28-101, et seq.)

300.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

301.    At all relevant times, Defendants engaged in the business of creating, testing, developing, designing, manufacturing, marketing, advertising, promoting, selling, wholesaling, distributing and representing its dicamba-tolerant crop products, which are unsafe, hazardous, defective and unreasonably dangerous to purchasers, consumers, end-users and persons reasonably expected to be affected, including Plaintiffs, thereby placing dicamba-tolerant crop products into the stream of commerce. These actions were under Defendants' ultimate direction, control and supervision.

302.    Defendants expressly and impliedly represented, warranted and made assurances to the general public, purchasers, consumers, end-users and persons reasonably expected to be affected of the safety of its dicamba-tolerant crop system, including Engenia, Xtendimax, Fexapan, and dicamba-tolerant seeds, by and through statements made in labels, publications, package inserts, and other written materials intended for purchasers and public to induce reliance and generate interest in and mass sales of its products and control the overall market for a general purpose herbicide and herbicide that is formulated with genetically-modified seeds.

303.    Defendants made affirmative warranties, representations, assurances and guarantees of safety for human health and the environment, that its dicamba-tolerant crop products were effective for herbicide control, were safe and proper for their intended use and would not cause harm to crops. Defendants made these affirmative warranties, representations, assurances and guarantees of safety for human health while knowing that its dicamba-tolerant crop products could cause extensive harm and injury to non-dicamba-tolerant crops, fruits and nuts.

304.    Moreover, Defendants engaged in an aggressive and active campaign to suppress and conceal the harmful facts from the public so that its overall warranties, representations,

assurances and guarantees of safety could generate a message to the public and purchasers that the dicamba-tolerant crop system was, in essence, a new, revolutionary, miracle type of herbicide that consumers and purchasers would feel compelled to purchase, but, not knowing that the herbicide was volatile and would harm non-dicamba-tolerant crops.

305.    Defendants' express and implied warranties including those made directly through their company and representatives, included false, deceptive and incomplete warnings and instructions that purport, but deceptively fail, to include the complete array of risks associated with use of and/or exposure to dicamba.  Defendants knew that risks expressly included in their products warning labels did not and do not accurately or adequately set forth the risks of developing the serious and permanent injuries to crops directly experienced by Plaintiffs and others in the public.

306.    Defendants aggressively campaigned to market, promote, advertise and warrant its dicamba-tolerant crop system products as safe and effective for the public as a general purpose agricultural herbicide, particularly when paired with dicamba resistant seeds. These representations, warranties and assurances about the dicamba-tolerant products contained or constituted affirmations of material fact or promises made by Defendants to the buyer and general public, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations, be safe for their intended purpose, and not cause serious and permanent harm to non-dicamba-tolerant crops.

307.    Defendants placed their dicamba seeds and their dicamba herbicides like Engenia, Xtendimax, and Fexapan into the stream of commerce for sale and recommended their use to consumers and purchasers and the general public without adequately warning of and disclosing

the true risks and dangers associated with exposure to the new formulations of dicamba used for GMO dicamba-tolerant crop seeds.

308.    Defendants breached these warranties because, among other things, its dicamba-tolerant crop system was unsafe, hazardous, dangerous, unfit and unsafe for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

309.    Defendants publicly represented that its dicamba-tolerant crop products were safe for use and made affirmative, fraudulent, misleading and deceptive statements to conceal the dangers and risks associated with their crop products and known to exist.  However, as part of its overall scheme to conceal and hide this negative information about its herbicide products, Defendants fraudulently concealed the information from people to hide and cover up the risk of harm to non-dicamba-tolerant crops.

310.    Defendants knew that the active ingredient in dicamba was harmful to non-dicamba-tolerant crops and due to the massive increase in the use of dicamba because of the aggressive, marketing, promotion and advertising campaign, and precluded safer alternatives from entering the marketplace.

311.    Defendants also knew that there is no herbicide formulation available to reduce the volatility in dicamba.  Defendants knew that the herbicide would be ineffective if the formula was reduced to a point where it is not volatile.

312.    Defendants violated ordinary care and prudent corporate behavior and responsibility through its labeling, advertising, marketing, promotion, representations, assurances and warranties that its dicamba-tolerant crop producers were safe and fraudulently withheld, suppressed, omitted and concealed information about the risks of serious and permanent injury to

crops associated with use of and/or exposure to dicamba formulations by expressly limiting the risks and hazards associated with use and/or exposure within its warning and labels.

313.   Defendants had sole access to material facts and information concerning the nature of the risk and hazards associated with its dicamba-tolerant crop products.  Defendants knew that purchasers, consumers and the general public would rely on labeling, advertising, marketing, promotion, its representations, assurances and warranties that its herbicides and dicamba-tolerant crop system was safe for its intended use and would not harm nearby neighbor's crops.

314.   Defendants knew through its superior knowledge and dominant and superior position in the marketplace that it could conceal, hide, suppress and cover-up the facts, data and research about its dicamba-tolerant crop products.  Therefore, in an effort to maximize its revenue, Defendants took affirmative steps to engage in such massive cover-up through the science and research of the dicamba-tolerant crop products and through regulatory agencies. Monsanto had knowledge that its labels and information were inadequate, inaccurate and false, yet perpetuated this suppression and concealment campaign to hide the truth from the general public, consumers and affected persons about the dangers associated with its dicamba-tolerant crop products.

315.   Plaintiffs and others similarly situated are affected persons who had no knowledge of the falsity, fraud or incompleteness of Defendants' statements, representations, assurances and warranties concerning dicamba-tolerant crop products and the dicamba-tolerant crop system's safety and safety to nearby crops.

316.   Plaintiffs' crops were exposed to Defendants' dicamba products, and Defendants knew they would be exposed by their research, development, design, testing, formulation,

manufacture, inspection, labeling, distribution, packaging, marketing, promotion, advertising, public representation, assurances and warranties made directly to the Plaintiffs and released into Tennessee, Kansas, Arkansas, Missouri, Mississippi, the fifty states, the general marketplace and stream of commerce by Defendants.

317.    Defendants could have prevented the serious imminent harm suffered by Plaintiffs if (1) Defendants not engaged in a massive world-wide ad campaign in the United States, including Tennessee, Kansas, Arkansas, Mississippi and Missouri, to hide, conceal, omit and suppress the truth of the dangers and risks associated with its herbicide products and dicamba-tolerant crop system, and (2) had Defendants made truthful representations, warranties, assurances and statements of fact about the dangers associated with the use of and exposure to its herbicide products and dicamba-tolerant crop system.

318.    Defendants breached their express warranties to the Plaintiffs and implied warranties to Plaintiffs in that their dicamba-tolerant crop products were not of merchantable quality, safe, or fit for their intended use.  Defendants' dicamba-tolerant crop products have inherent, unsafe, hazardous, volatile and dangerous propensities, which directly resulted in and caused serious and permanent harm and injury to Plaintiffs' crops, which would not have occurred, but for the unsafe products and but for Defendants' statements, representations, warranties, assurances and guarantees that its products conform to and are a safe product for public use and would not harm nearby crops.

319.    Defendants knew the dicamba-tolerant crop products would not conform to any label because Defendants hid, concealed and suppressed the truth about the danger of its products and made false representations of material fact directly resulting in and causing harm to the Plaintiffs for which Plaintiffs seek remedy under breach of express and implied warranties.

## H.      EIGHTH CAUSE OF ACTION - FRAUD

320.     Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

321.     Defendants made a false representation of material fact when they represented, advertised and promoted the sale and use of dicamba seeds as a higher-yielding and safe soybean seed and that dicamba-tolerant crop system was safe for neighboring crops.

322.     Defendants made a false representation of material fact when they represented, advertised and promoted the use of dicamba seeds, knowing the dicamba-containing herbicide used in conjunction with the seeds would harm any crops that were not dicamba-resistant.

323.     Defendants made a false representation of material fact when they represented, advertised and promoted the sale and use of dicamba seeds for a higher yield, with the knowledge that the seeds would not produce a higher yield and that dicamba-containing herbicides were not safe for neighboring crops.

324.     Defendants made a false representation of material fact when they secretly promoted the use of dicamba-containing herbicide with the knowledge that it had not been approved by the EPA.

325.     Defendants made a false representation of material fact when they secretly promoted the use of dicamba-containing herbicide to farmers with the knowledge that the herbicide unsafe, inherently dangerous, hazardous, defective and volatile for neighboring crops.

326.     The Plaintiffs, and others similarly situated, justifiably relied upon Defendants' misrepresentations.

327.     Defendants' misrepresentations substantially influenced the farmers to implement the Defendants' dicamba-tolerant crop system.

328.    The Plaintiffs, and others similarly situated, justifiable reliance on the misrepresentations by Defendants and the distributors resulted in damages to valuable property and monetary damages.

329.    The misrepresentations, which amount to misrepresentation, fraud, deception and deceit, has resulted in detriment and damages to both the farmers who planted the seeds and unsuspecting third-party farmers who did not implement the Defendants' dicamba-tolerant crop system.

## I.    NINTH CAUSE OF ACTION - UNJUST ENRICHMENT

330.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

331.    As a result of their illegal, deceptive, and tortious actions, Defendants have been enriched through the sale of dicamba seeds and their herbicide products like Engenia, Xtendimax, and/or Fexapan.

332.    By manipulating the public and marketing a product it knew to be unsafe for non-dicamba-resistant crops, Defendants chose to enrich themselves knowing such enrichment would result in the direct destruction of valuable property, including Plaintiffs' and others similarly situated.

333.    Defendants forced third parties to serve as an involuntary experimental testing ground for its new products.  Defendants have enriched themselves by knowingly destroying the crops of innocent third parties, including Plaintiffs and others similarly situated with unlawful gain based upon false, fraudulent and deceptive representations and trade practices to the harm and detriment of others.

334.    Upon information and belief, Defendants have unfairly and unjustly benefited and retained hundreds of millions in profits from the negligent and premature sale of dicamba seeds and corresponding dicamba-based herbicides like Engenia, Xtendimax, and/or Fexapan as a direct result of Defendants' unlawful and wrongful actions.

335.    Defendants knew their products were prematurely released, not fully tested as to their inherent volatility and danger and knew they would reap profits at the expense of farmers and crop growers, such as Plaintiffs who did not purchase their products and would be damaged by the inherently volatile nature of their crop-system.

336.    The acceptance and retention of these profits is unjust because the profits are a direct benefit to Defendants as a result of their unlawful tortious conduct resulting in money had and gained by Defendants while damaging and causing detrimental and unjust harm to Plaintiffs and others similarly situated where equity and good conscience would require restitution and disgorgement.

337.    Defendants should pay and make restitution for damage experienced by Plaintiffs, and others similarly situated, and be ordered to disgorge all unjust enrichment it has received to date and will receive for the next five (5) years from all sale of their dicamba-tolerant seed and herbicide products.

## J.    TENTH CAUSE OF ACTION - CIVIL CONSPIRACY

338.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

339.    Defendants, in an unlawful, fraudulent, deceptive scheme and device to improperly market and expand the sales of its defective dicamba-tolerant crop system, conspired to place unsafe, defective, inherently dangerous, hazardous and volatile herbicides on the

marketplace with GMO seeds that were dicamba-tolerant when Defendants knew that nearby neighboring crops which were not dicamba-tolerant would be harmed, injured or wiped out, causing financial harm and forcing those farmers to buy their dicamba-tolerant crop system to avoid crop failure and financial ruin.

340.    The object of the unlawful conspiracy and agreement was the unlawful marketing of Defendants' defective dicamba-tolerant crop system, the protection of its dicamba seeds and crops through the illegal spraying of dicamba-containing herbicides on those seeds and crops and a proliferation of its dicamba seeds through marketing to corner the market for genetically modified soybeans and cotton such that farmers in Tennessee would have no choice but to purchase Defendants' dicamba seeds or risk destruction to their non-dicamba tolerant crops.

341.    Defendants, through their agents and representatives, encouraged and directed its purchasers to spray dicamba-based herbicides on the dicamba-tolerant seeds even though Defendants knew the volatile dicamba herbicide would drift to nearby crops and injure the crops.

342.    Defendants' scheme to sell more dicamba seeds and dicamba-based herbicides by harming those farmers that did not originally purchase the dicamba-resistant seeds caused severe, imminent and irreversible harm to the Plaintiffs' land, crops, and livelihoods.

343.    Defendants' unlawful and wrongful actions resulted in extensive damages to Plaintiffs, and others similarly situated, for which the Defendants should be held liable.

### K.    ELEVENTH CAUSE OF ACTION – PRIVATE NUISANCE

344.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

345.    Defendants' actions constitute a private nuisance to Plaintiffs and other Class members.   By releasing the dicamba-tolerant seed and dicamba spray, Defendants have

unreasonably and substantially interfered with Plaintiffs' and other Class Members' quiet use and enjoyment of their land and/or property interests.

346.    Defendants' actions proximately caused damage Plaintiffs and other Class members who thus are entitled to compensatory damages and prejudgment and post-judgment interest.

347.    Defendants' conduct was intentional, willful, wanton, and with reckless disregard for the rights of Plaintiffs and other Class members, and was grossly negligent and unreasonable. Punitive damages are thus warranted.

### L.    TWELFTH CAUSE OF ACTION – TRESPASS TO CHATTELS

348.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

349.    By commercializing dicamba seed, dicamba spray, and the dicamba-tolerant crop system without adequate systems to isolate it from damaging non-dicamba-tolerant crop, Defendants intentionally intermeddled with and brought dicamba seed, dicamba spray, and the dicamba-tolerant crop system into contact with non-dicamba-tolerant crop in which the Plaintiffs and other Class members had possession and/or possessory rights.

350.    Defendants knew that its conduct would, to a substantial certainty, bring its dicamba seed, dicamba spray, and the dicamba-tolerant crop system into contact with Plaintiffs' crop through contamination and volatility in fields.

351.    As a result of the trespass, these Plaintiffs' chattels were impaired as to condition, quality or value, and Plaintiffs were damaged.

352.    Plaintiffs and other Class members are thus entitled to an award of compensatory damages and prejudgment and post-judgment interest.

353.     Defendants' conduct was malicious and constitutes a willful and wanton invasion of the rights of others, including the Plaintiffs and other Class members.  Punitive damages are thus warranted.

## VIII. PUNITIVE DAMAGES

354.     Defendants knew or should have known that their products are unsafe, volatile, defective, inherently dangerous and misbranded.  Defendants knew or should have known that: (a) dicamba-containing products have a propensity to drift great distances in minute amounts, (b) that dicamba is severely phytotoxic to non-target crops, (c) that non-target are grown in the same vicinity in Tennessee as dicamba seeds, and (d) that dicamba has caused damage to crop in Tennessee in the past.  Despite this knowledge, each Defendant continued to manufacture, market, sell, supply, and distribute dicamba seeds, which constitutes a conscious disregard for the welfare of others and their property, from which malice and wanton or reckless disregard for public safety can be inferred.

355.     Defendants' campaign to market and rapidly commercialize the dicamba-tolerant crop system, including Engenia, Xtendimax, Fexapan, and other herbicides, was premised on its ability to influence data, omit information, direct and control data and information disseminated or not disseminated about the dicamba-tolerant crop system dangers and hazards to nearby non-dicamba tolerant crops.  Defendants knowingly suppressed, concealed and omitted from the public the truth about the dangers and hazards of its herbicide products to non-dicamba tolerant crops.  However, knowing that its herbicide and dicamba-tolerant crop products were unsafe and volatile to nearby crops, Defendants intentionally pursued a course and pattern of corporate conduct where it knew, or ought to have known, in light of the evidence and surrounding circumstances, that it was going to conceal, suppress and omit material information about the

danger to humans its products, in order to reach billions in sales and control the marketplace for dicamba-based herbicide for their dicamba seeds.  Defendants deliberately and consciously chose billions in profits over the safety and financial well-being of farmers who did not buy dicamba-tolerant crops.

## IX. JURY TRIAL DEMANDED

356.    Plaintiffs respectfully demand a trial by jury on all issues so triable.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully ask this Court:

a)    For an order certifying this lawsuit as a class action under Fed. R. Civ. P. rule 23, appointing counsel herein as class counsel and named Plaintiffs as class representatives.

b)    For a judgment for actual and compensatory damages in accordance with the proof at trial;

c)    For a judgment for punitive damages;

d)    For Plaintiffs' costs, expert fees, disbursements and attorneys' fees incurred in prosecuting this action as permitted by statute, common benefit fund, common fund doctrine or other permissible law or doctrine;

e)    For restitution and disgorgement of profits that Defendants have received to date and will receive for the next five (5) years;

f)    For pre-judgment and post-judgment interest at the maximum lawful rate; and

g)    For such other relief as the Court deems just, necessary or proper.

Respectfully submitted,

By:     _/s/ W. Bryan Smith_____
W. Bryan Smith, (#18230)
**Morgan & Morgan – Memphis, LLC**
One Commerce Square, Suite 2600
Memphis, Tennessee 38103
Telephone: 901-333-1813
Facsimile: 901-524-1771
bryans@forthepeople.com

-and-

Paul Byrd, (ABN #85020)
Joseph Gates, (ABN #2010239)
**Paul Byrd Law Firm, PLLC**
415 N. McKinley St. Suite 210
Little Rock, Arkansas 72205
Telephone: 501-420-3050
Facsimile: 501-420-3128
paul@paulbyrdlawfirm.com
joseph@paulbyrdlawfirm.com
(*pro hac* pending)

-and-

Jerry Kelly, ABN #84085
**Kelly Law Firm, P.A.**
P.O. Box 500
Lonoke, AR 72086
Telephone: 501-676-5770
jkelly@kellylawfirm.net
(*pro hac* pending)

-and-

Winston B. Collier, ABN #2007184
**The Collier Firm**
107 S. 2nd Street
P.O. Box 534
Augusta, AR 72006
Telephone: 870-347-2100
winston@thecollierfirm.com
(*pro hac* pending)